## DALY v. BUSK TUNNEL RY. CO.

### (Circuit Court of Appeals, Eighth Circuit.   March 17, 1904.)

### No. 1,963.

**1. CONTRACT FOR MAKING TUNNEL—CONSTRUCTION—RIGHT TO CHANGE DIMENSIONS.**

A contract for the construction of a railway tunnel through a mountain nearly two miles in length fixed the dimensions of the tunnel and the price per lineal foot to be paid the contractor for excavating the same. It contained the further provision: "(6) It is understood and agreed that the railway company shall have the right to make such changes in the amount, dimensions or character of the work to be done, as in the opinion of the chief engineer the interests of said work or of the company may require; * * *. Any increase in the amount of work to be done, that may be caused by such changes, shall be paid for at the same rate as similar work is herein contracted to be paid for." Printed specifications attached to the contract contained a provision that "the right is reserved to vary the standard dimensions of the tunnel should the engineer deem it advisable, but the end area shall not thereby be increased." *Held,* that the latter provision was not intended to prohibit the company absolutely from enlarging the end area or cross-section of the tunnel, but, when construed in connection with the provision of the contract proper, meant that it should not be so enlarged as to require the removal of more material for the contract price per lineal foot, and that if so enlarged the contractor should be entitled to extra pay; that such changes, therefore, were not a variation from the contract which would release the surety on the contractor's bond from liability, though made without his knowledge or consent.

**2. SAME—CONFLICTING PROVISIONS.**

In case of a conflict between the provisions of a contract for the construction of a tunnel and those of printed specifications attached thereto which were prepared previously for general use in connection with such contracts and not with reference to that particular contract, those of the contract itself must control.

**3. SETTLEMENT—IMPEACHMENT FOR MISTAKE—FAILURE TO DRAW PROPER INFERENCE FROM KNOWN FACTS.**

A surety on the bond of a contractor for work, who settled a demand made on him for his principal's default after long negotiation, in which he was represented by an attorney, cannot impeach such settlement for mistake of fact in that the other party had, in violation of the contract, paid to the contractor as the work progressed the greater part of the 10 per cent. on the amounts due on monthly estimates, which the contract provided should be reserved until the completion of the work, of which fact he was ignorant when the settlement was made, where it is shown that all the facts were freely furnished to his attorney, including statements showing the total value of the work done by the contractor, and the total amount paid him, from which the inference was obvious that such payments included a large part of the reserved percentage.

**4. SAME—SURETY—DUTY OF OPPOSING PARTY IN NEGOTIATIONS.**

In negotiations for the settlement of a disputed demand, the fact that one of the parties is a surety does not require the other party to call his special attention to the bearing of facts known to both, or the inferences to be drawn therefrom.

**5. SAME—CONSIDERATION.**

The law favors the compromise of doubtful claims, and the avoidance of litigation is a sufficient consideration to support such agreements, even though it eventually appears that if the demand had been litigated no recovery could have been had.

---

¶ 5. See Compromise and Settlement, vol. 10, Cent. Dig. § 40.
129 F.—33

In Error to the Circuit Court of the United States for the District of Colorado.

This action was brought by Margaret P. Daly, as executrix of Marcus Daly, deceased, the plaintiff in error, against the Busk Tunnel Railway Company, the defendant in error (hereinafter termed the "Tunnel Company"), to recover the sum of $22,500 which had been paid by the plaintiff's intestate to the Tunnel Company on October 28, 1895. The grounds on which the plaintiff predicated her right to recover were these: She alleged, in substance, that on July 21, 1890, the Tunnel Company entered into a contract with one Michael H. Keefe by virtue of which he undertook to construct for the Tunnel Company a tunnel underneath the crest of the Rocky Mountains between the stations of Busk and Ivanhoe, on the line of the Colorado Midland Railway; that on July 25, 1890, her intestate became a surety on the bond of said Keefe in the sum of $100,000, conditioned that Keefe would "well and truly keep and perform each and all of the terms and conditions of said contract on his part to be kept and performed"; that Keefe began the work of construction after the execution of the contract and bond, and prosecuted it until July 22, 1893, when he abandoned the work, leaving the tunnel unfinished; that during the progress of the work the height and width of the tunnel were increased above the height and width called for by the contract and specifications, such alteration in the height and width being made by agreement between Keefe and the Tunnel Company without the knowledge of the surety; also that the contract provided that 10 per cent. of the monthly estimates of work done by the contractor should be withheld from him until the final completion and acceptance of the work, and that, in violation of this provision of the contract, the Tunnel Company, without the knowledge of the surety, paid Keefe $61,000 of the sum of money which it should have retained until the completion of the work. It was then averred, in substance, that, after Keefe had abandoned the work, the Tunnel Company made a claim against the plaintiff's intestate, who was one of the sureties on his bond, in the sum of $100,-000, claiming that it had sustained damages to that amount in consequence of Keefe's failure to execute the contract, and that, to induce the surety to compromise and pay said claim or a part thereof, the Tunnel Company "falsely represented [to him] that it had in all things kept and performed the conditions of said contract by it to be kept and performed," although it well knew that it had entered into an agreement with Keefe whereby material alterations had been made in the terms of the contract between itself and Keefe; and that, relying upon such representations as were made by the Tunnel Company, and believing that he was liable upon the contract for the damages which the Tunnel Company had sustained by reason of the failure of said Keefe to complete the tunnel, and being ignorant that any alterations had been made in the terms of the agreement in the respects heretofore stated, he was induced to pay to the Tunnel Company, by way of settlement and compromise of his liability on the bond, the sum of $22,500, for which amount the plaintiff below prayed judgment. At the conclusion of the trial in the lower court the plaintiff and the defendant each asked the court to direct a verdict in their favor. The plaintiff's motion to this effect was overruled, while the defendant's motion was granted, whereupon a verdict and judgment was rendered in its favor. The case has been brought to this court for review on a writ of error which was sued out by the plaintiff below.

T. J. Walsh (John H. Knaebel and Ernest Knaebel, on the brief), for plaintiff in error.

Lucius M. Cuthbert (Henry T. Rogers, Daniel B. Ellis, and Pierpont Fuller, on the brief), for defendant in error.

Before SANBORN, THAYER, and HOOK, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

In view of the foregoing statement, it will be observed that the case at bar is prosecuted upon the theory that, when the plaintiff's intestate

paid the sum of $22,500 by way of compromise and settlement of his liability as a surety on the bond of Keefe, he had in fact been released from all liability thereon by reason of the action of the Tunnel Company in enlarging to a certain extent the bore of the tunnel by agreement with Keefe, and also by reason of its action in paying to the contractor the sum of $61,000, which, under the terms of the contract, it should have retained until the completion of the work. It is claimed that these acts constituted material alterations in the terms of the contract, which the surety promised should be faithfully performed according to its terms, and not otherwise; that he was ignorant of these alterations at the time he made the settlement and compromised his supposed liability; that it was the duty of the Tunnel Company to have advised him of its action in the matters aforesaid before negotiating a settlement, and that, as it did not do so, the money which it received may be recovered as money paid under a mistake of fact.

The first question to be considered, therefore, is whether any such change was made in the height or width of the tunnel as operated to release the surety on the bond of the contractor, assuming such change of dimensions to have been made without the knowledge of the surety. The contract, which was prepared by the attorneys of the Tunnel Company with especial reference to the work which was to be done by Keefe, was typewritten, and signed by both of the contracting parties. Annexed to this contract, and referred to therein as a part thereof, were certain printed specifications, which were not drawn, at the time the contract was made, with especial reference to the construction of the tunnel in controversy, which is commonly called the "Busk Tunnel," but had been prepared some time before that tunnel was projected, and were kept on hand by the engineers of the Tunnel Company for general use in connection with whatever construction work they might have occasion to do. The printed specifications in question, which were annexed to the contract, related to railway construction generally, and to various kinds of work which Keefe did not undertake to do and was not expected to do. These printed specifications, under the heading "Tunnel," contained the following clause:

"The floor will be flat, and excavated to six (6) inches below grade. The roof will be a gothic arch described with a radius of ten and one half (10½) feet from a line ten (10) feet above grade. The side walls will be vertical to a height of ten (10) feet and parallel to and seven (7) feet six inches from the center line. The total height of tunnel from floor to center of roof will be twenty (20) feet six (6) inches."

Farther on in the specifications, under the same heading, is found the following clause:

"Bills or claims for extra work must be rendered within thirty (30) days after it has been done, and in all cases not later than the end of the next succeeding month. The right is reserved to vary the standard dimensions of the tunnel should the engineer deem it advisable; but the end area shall not thereby be increased. The price per lineal foot of tunnel will include the haul of materials and deposits in embankments at each end of tunnel as directed by the engineer."

The contract proper, and by this is meant the typewritten part, which was prepared with special reference to the work which the contractor was to do, contained the following provisions:

"(6) It is understood and agreed that the railway company shall have the right to make such changes in the amount, dimensions or character of the

work to be done, as in the opinion of the chief engineer the interests of said work or of the company may require; * * *. Any increase in the amount of work to be done, that may be caused by such changes, shall be paid for at the same rate as similar work is herein contracted to be paid for; and if such work is not similar to that herein contracted for, it shall be paid for as extra work at prices to be agreed upon between the chief engineer and contractor prior to the commencement of said extra work, but if the contractor and chief engineer are unable to agree upon a price for said work, then the railway company may enter into contract with any other party or parties for its execution, the same as if this contract had never existed.

"(7) In consideration of the faithful performance of the covenants and agreements made by the contractor, the railway company hereby covenants and agrees to pay or cause to be paid to the contractor, his executor or administrator, the rates and prices hereinafter named, to-wit: * * * Excavation: Earth, twenty-five cents—Per·Cubic Yard. Excavation: Loose Rock, Forty-five cents (45c)—Per cubic Yard. Excavation Solid Rock, One Dollar and thirty cents ($1.30) per cubic yard. Tunnel Excavation, Sixty-two dollars and fifty cents ($62.50) per lineal foot. For tunneling enlargement to receive timber,—Two Dollars & fifty cents ($2.50) per cu. yard."

The evidence shows that after about 1,000 feet of the tunnel had been constructed, counting the construction at both ends, the contractor was permitted by the engineer in charge of the work to make the height of the tunnel 21 feet, instead of 20 feet 6 inches, as called for by the specifications, and he was paid for the extra amount of excavation thus occasioned at the rate of $2.50 per cubic yard for all extra material that was removed. This change in height was allowed, as it seems, mainly for the accommodation of the contractor. He found it quite difficult, in blasting, to make the floor of the tunnel smooth and exactly 20 feet and 6 inches below the center of the roof of the tunnel at all places. In the process of blasting, "hummocks," as they are termed, would be left in the floor, projecting up into the ballast, which was required to be six inches in depth below grade. These hummocks projecting up into the ballast had the effect of lessening the elasticity of the track, and they could only be removed by the contractor with small blasts of powder, which work occasioned some difficulty and expense. To overcome the difficulty the contractor was permitted to excavate 12 inches below grade instead of 6, so as to avoid the hummocks and the cost of removing them, and he appears to have availed himself of this privilege with alacrity so as to avoid expense. The evidence further discloses, without any substantial controversy, that while the side walls of the tunnel were required to be 7 feet and 6 inches distant from the center line of the track, making the tunnel 15 feet wide between the inside faces of the timber which supported the side walls and the arch, yet it was in fact made about two and three-eighths inches (2⅜) wider for the greater part of its length, and for the following reasons: The work had been in progress for some time when it was discovered that, if the wall plates were set exactly 15 feet apart in the first instance, the pressure of the mountain, and the blasting which was being done within the tunnel, had a tendency to crowd them inward a short distance, leaving the tunnel a little less than 15 feet wide in the clear; and, as it was necessary that the tunnel should be that wide to insure the safe passage of trains, and as the contract called for that width, the contractor was compelled at times to go back over his work, and, by removing rock and débris back of the timbers, press them back into place.

To overcome this difficulty it was agreed by the contractor and the engineer in charge that the wall plates might be set $15^2/10$ feet apart in the first instance, so as to make good the shrinkage in width which was incident to the pressure and blasting, thereby leaving the tunnel 15 feet wide between the inside faces of the timber which supported the side walls. The contractor appears to have availed himself of this privilege very readily, as, by setting the wall plates $15^2/10$ feet apart in the first instance instead of 15 feet, it relieved him of considerable trouble and expense. These are the alleged changes in the height and width of the tunnel which the plaintiff below relied upon to relieve the surety of his liability upon the bond.

It is insisted, in behalf of the plaintiff in error, that the words "end area" as used in the specifications, means the superficies of an end of the bore of the tunnel, and that it can mean nothing else; that the alterations aforesaid in the height and width of the tunnel increased its "end area" and the solid contents of the bore of the tunnel, contrary to the letter of the specifications, and for that reason the surety was released, the changes having been made without his knowledge, although such changes appear upon this record to have been to the advantage of the contractor rather than to his disadvantage. On the other hand, the Tunnel Company contends that by its agreement with the contractor it expressly reserved the power "to make such changes in the amount, dimensions or character of the work" as were in fact made; that this clause of the contract does not in fact conflict with the inhibition contained in the specifications against increasing the "end area," and that, if there is an irreconcilable conflict between the contract and the specifications, the latter must give way to the former, because the contract was prepared with especial reference to the work in question, while the specifications were not so prepared; and that the contract, rather than the specifications, must accordingly be taken as expressing the true intent of the parties. It is further claimed by the Tunnel Company that as the work of excavating the tunnel was to be paid for at the rate of $62.50 per lineal foot, and as a cross-section, 1 foot in thickness, of the tunnel as projected, contained 9.91 cubic yards of material, as shown by the blue prints which were prepared by the company's engineer, and in pursuance of which bids for doing the work were invited and the contract with Keefe was entered into, the provision in the specifications against increasing the "end area" simply means that the contractor should not be compelled to move more than 9.91 cubic yards of material in excavating 1 lineal foot of the tunnel, and that if, by reason of necessary changes in the bore, he was required at any time to move more than that amount of material, he should be paid therefor as for extra work at the contract rate. In other words, it is said that this clause of the specifications was not intended to deprive the Tunnel Company of the power reserved to itself in the contract to make such changes in the bore of the tunnel as it found necessary to make, but rather to protect the contractor and insure him adequate compensation for his work if such changes necessitated the excavation of more than 9.91 cubic yards of material in advancing the tunnel 1 foot.

With reference to these contentions, it is to be observed that the changes in the height and width of the tunnel did not in fact increase

its "end area," if these words are taken literally, because the change was not made until work at each end had proceeded some distance, and the end areas do not appear to have been altered. These words, however, should not be read literally. The last observation is made for the purpose of showing that the words "end area" admit of some latitude of construction, and that the contract, considered as a whole, must receive a reasonable interpretation, having reference to the situation of the parties when it was made, and the character and magnitude of the enterprise to which it related, as well as the uncertainty concerning the difficulties that might be encountered as the work progressed. We entertain no doubt that the Tunnel Company intended to reserve the power to make such reasonable changes in the bore of the tunnel as the necessities of the work might require. Indeed, we can scarcely conceive that a company engaged in constructing a tunnel nearly two miles in length through a high mountain, and being at the time ignorant of the character of the materials and the obstructions which it might encounter, would deliberately agree that the size of the bore should not be increased even a few inches. It is customary, so far as we have observed, for companies which are engaged in the prosecution of such great enterprises as the one in hand to reserve a large power of control over the work, as well as the right to make such reasonable changes in the original plans for doing the same as the circumstances of the case may demand; but, whether customary or not, the power in question was reserved by the Tunnel Company in the clearest language by the contract which it entered into with Keefe, the provision being that it should "have the right to make such changes in the amount, dimensions or character of the work to be done as in the opinion of the chief engineer the interests of said work or of the company may require." And we·can scarcely conceive that after having its attention directed to this subject, and after reserving this power, it intended to relinquish it by the provision contained in the specifications against increasing the "end area," as it did do if that clause is understood to prohibit a change in the bore of the tunnel to any extent that would enlarge its cubical contents. For these reasons we are of opinion that the clause found in the specifications against increasing the "end area" does not mean that the Tunnel Company should not enlarge the dimensions of the bore of the tunnel to any extent, but that it means rather, as the Tunnel Company claims, that the bore of the tunnel should not be so enlarged as to compel the contractor, in driving it 1 lineal foot, to excavate more than 9.91 cubic yards of material for the sum of $62.50, and that, if so enlarged as to require the removal of a greater quantity of material, he should receive extra pay.

If the foregoing is not the true interpretation of the clause found in the specifications against increasing the "end area," and if the language employed means necessarily that the bore of the tunnel should not be enlarged to any extent, then we should be of opinion that the clause in question is in conflict with the provision of the contract heretofore quoted, and is controlled thereby. It is one of the fundamental rules for the construction of agreements that, when a contract is prepared on a printed form, words in, writing prevail over words in print. This is upon the theory that words in writing express the actual and

final intent of the parties, and that clauses in conflict therewith which may be found in print were probably overlooked, and should not be given the same weight as words in writing that were consciously employed by the contracting parties. Hernandez v. Sun Mutual Life Ins. Co., 6 Blatchf. 317, 12 Fed. Cas. 34, 37; Duffield v. Hue, 129 Pa. 74, 18 Atl. 566, 568; Chadsey v. Guion, 97 N. Y. 333, 339; Bishop on Contracts, § 413; Am. & Eng. Ency. of Law (2d Ed.) vol. 17, p. 21. We think the reasons upon which this rule of interpretation is founded are applicable to the case in hand. The contract proper, that is, the type-written part, was prepared with especial reference to the construction of the Busk Tunnel, and no other. Every clause which it contains must be presumed to have passed under the scrutiny of the contracting parties, and to express their real purpose. The specifications, on the other hand, were not so prepared, but were kept in stock in the engineer's office for his convenience, to be attached, when occasion required, to contracts for whatever work he might have occasion to let. It is reasonable to presume that they were not carefully revised and re-read on all occasions when they were appended to a contract, but that they were sometimes annexed without revision, on the assumption that they were not substantially in conflict therewith. Particular clauses found in an instrument of that kind should not, in our judgment, be accorded the same weight in arriving at the intention of the contracting parties as stipulations found in the contract itself, provided they are at variance. And this is so, we think, although the contract may contain a clause declaring that a paper attached thereto forms a part thereof. We accordingly conclude that the changes which were made in the height and width of the tunnel were made in pursuance of an authority reserved to the engineer in charge of the work to make such changes, and that they did not operate, as claimed, to release the surety from his liability on the contractor's bond.

This brings us to a consideration of the question whether the surety was released from his obligation on the bond because reserved percentages to the amount of $61,000 were paid to the contractor in advance of the completion of the tunnel. The contract provided, in substance, that approximate estimates of the value of the work done should be made on or about the last day of each month, and that the amount of said estimates, less 10 per cent., should be paid to the contractor, and that the reserve percentage should be withheld by the Tunnel Company until the final completion and acceptance of the work; also that the contractor should be subject to the laws of the state of Colorado regarding liens for labor or materials furnished for the work, and should protect or indemnify the Tunnel Company against all claims upon it or liens upon the premises for labor or materials furnished, and that the Tunnel Company might, whenever it deemed proper and expedient to do so, pay to the laborer or other persons employed by the contractor, or who had furnished materials for said work, out of any moneys due for any monthly or other estimates, any sums due for labor, services, or materials under the contract, and might charge the payments to the contractor as so much paid on his contract. As early as February 21, 1891, Keefe, the contractor, appears to have become involved in debt for labor and materials furnished in constructing the tunnel, which he was

unable to pay. He applied to the Tunnel Company for relief, and on that occasion, and three others between that date and June 6, 1893, he was paid, on account of the reserved percentages, various sums amounting in the aggregate to $61,000. These payments, as it is claimed, having been made contrary to the terms of the contract, released the surety. We are satisfied, however, that the plaintiff's intestate was chargeable with knowledge that these payments had been made to Keefe before he compromised his liability on the bond by the payment of $22,-500 on October 28, 1895. The testimony shows that when the plaintiff's intestate was called upon to discharge his liability on the bond, after Keefe had abandoned the work, and as early as the month of May, 1894, he employed a capable attorney residing at Denver, Colo., to examine into the merits of the claim and protect his interests, and that he later gave his attorney full authority to represent him in negotiating a settlement. The Tunnel Company was represented by an attorney who also resided in Denver. From that time forward until October 28, 1895, negotiations looking to a compromise were in progress between the two attorneys, and they seem to have been conducted with great deliberation. In the meantime all the information relating to the controversy which was called for by counsel who represented the plaintiff's intestate was promptly furnished by the Tunnel Company without reservation, and without any apparent effort to conceal any material fact or circumstance relating to its dealings with the contractor. Indeed, counsel for the plaintiff's intestate who conducted these negotiations exonerates the attorney of the Tunnel Company from all charges of fraud or the suppression of material facts, by the admission, made under oath, that the negotiations looking to a settlement were conducted with entire good faith on both sides. As early as July 2, 1894, the attorney who represented the plaintiff's intestate was furnished with a statement of account between the Tunnel Company and the contractor, which showed that the contractor had been paid by the Tunnel Company $647,259.64 on account of work done. On August 24, 1895, he was handed a letter and a statement which showed that the value of the work done by the contractor up to July 21, 1893, when he abandoned the contract, amounted to $662,923.60 at contract rates, and that the work thereafter done by the Tunnel Company to finish the tunnel amounted in value to $77,771.85. A letter written by the same attorney to the plaintiff's intestate of date October 10, 1895, shows conclusively that he understood and advised his client at that time that the Tunnel Company had paid Keefe in all the sum of $647,259.64, and that it only owed him, when he abandoned the work, the sum of $17,783.-96. Knowing, as he did, that the total value of the work which had been done by Keefe, estimated at the contract price, was $662,923.60, and that he had been paid something over $647,000, he must have been aware that the greater part of the reserved percentages had already been paid to the contractor. Moreover, it is shown by the testimony that the various receipts which were given by the contractor for money paid to him out of the reserved percentages were handed to an accountant whom the attorney for plaintiff's intestate had employed to examine the various statements and vouchers relating to the construction of the tunnel, and that these receipts thus placed in the hands of the accountant

showed on their face out of what fund and on what account the payments in question had been made. It is manifest, we think, that, if the compromise was made while plaintiff's intestate was ignorant of the fact that Keefe had received $61,000 out of the reserved percentages, such ignorance was due to a failure on his part, or that of his agent, to draw a proper inference of fact from facts which were communicated; and, where one pays money to settle threatened litigation under such circumstances, it cannot be said that he pays it under a mistake of fact. He pays it rather with a knowledge of facts which the law imputes.

The case has been argued in this court by learned counsel for the plaintiff in error upon the theory, apparently, that it was the duty of the attorney who represented the Tunnel Company to specially invite the attention of the opposite party to the fact that the greater part of the reserved percentages had been paid, and that such was his duty, because the claim was against a surety, and for that reason involved the exercise of the highest degree of good faith. Conceding, for the purposes of the present case, that a higher degree of good faith was requisite than in ordinary cases, because the rights of a surety were involved, we cannot accede to the proposition that an obligation rested on the attorney for the Tunnel Company to invite special attention to the fact that the reserved percentages had been in great part paid. It was sufficient, we think, to advise the opposite party what was the total sum earned by Keefe, and how much of the sum earned had in fact been paid. He was dealing with a competent attorney who had been employed by the surety to attend to his interests, who was doubtless well acquainted with the provisions of the contract between Keefe and the Tunnel Company, and fully qualified to decide whether the right to recover against his client had been impaired by the payments that had been made, the extent of which he well knew. Although he represented a surety, he was not wholly absolved from the duty of making inquiries or deductions from facts within his knowledge, nor was he privileged to rely blindly on such information as the opposite party saw fit to communicate, without seeking other information that might be of advantage to his client. It is most probable, we think, that the attorney for the Tunnel Company regarded the payments that had been made to the contractor as payments which it had the right to make under the provisions of the contract reserving to it the right to discharge claims for labor, services, and materials which might become a lien on the tunnel, and it may be that he was right in that view of the case, although no opinion need be expressed on that question. For, whether that view is right or wrong, he communicated enough facts to the opposing party to bring the question sharply to his attention, and he was not required to go further. The law favors the compromise of doubtful claims, and the avoidance of litigation is a sufficient consideration to support such agreements, even though it eventually appears that, if the demand had been litigated, no recovery could have been had. It will not suffer them to be set aside on slight grounds. Cleaveland v. Richardson, 132 U. S. 318, 10 Sup. Ct. 100, 33 L. Ed. 384; Hager v. Thompson et al., 1 Black, 80, 94, 17 L. Ed. 41; Graham v. Meyer, 99 N. Y. 611, 1 N. E. 143; Swem v. Green, 9 Colo. 358, 364, 12 Pac. 202;

Brooks v. Hall, 36 Kan. 697, 14 Pac. 236; Grandin v. Grandin, 49 N. J. Law, 508, 514, 515, 9 Atl. 756, 60 Am. Rep. 642. In the present instance it is certainly true that there was sufficient doubt of the ability of the plaintiff's intestate to make a successful defense against the claim, which was preferred against him by the Tunnel Company, to sustain an agreement of compromise, and, as it was made without the semblance of fraud, and without the suppression of any facts within the knowledge of the Tunnel Company which it was bound to disclose, we think it should be upheld.

The judgment below is accordingly affirmed.