[S. F. No. 10221. In Bank.—June 19, 1923.]

## SNOW MOUNTAIN WATER AND POWER COMPANY, Respondent, v. W. A. KRANER, Appellant.

[1] CONTRACT—CONSTRUCTION OF DAM—CHANGE IN PLANS—REASONABLENESS OF.—Where a contract for the construction of a large dam provided that the owner should have the right to make, by orders in writing, such reasonable alterations, omissions, additions,

---

Recovery by one who abandons a contract for work or labor or services without excuse or justification, note, L. R. A. 1916E, 790.

or substitutions in the plans and specifications as it might deem necessary, and the contractor was to accede to and carry into effect all such alterations, omissions, additions, or substitutions as though they were originally provided for in the contract, and the object of inserting such provision in the contract was to afford the right to change the original plans to meet such physical condition as could not be learned in advance and as might be encountered in the progress of the work, alterations ordered by the owner changing the axis of the dam were within the scope and object of the contract and plan, if such alterations were reasonable.

[2] ID. — ABANDONMENT — REMOVAL OF EQUIPMENT — INJUNCTION — CHANGE IN AXIS OF DAM—REASONABLENESS OF—QUESTION OF FACT —FINDING—EVIDENCE.—In an action by an owner to restrain a contractor from removing the latter's tools, equipment, and supplies from the site of a dam agreed to be constructed by him under a contract, which provided that in the event of abandonment of the work by the contractor, the owner might take over all the tools, equipment, and supplies of the contractor and proceed to complete the dam, and which further provided that the owner might make, by written order such changes in the original plans as it might deem necessary, the question whether or not the change in the construction of the dam from a straight line axis to an angle of 44 degrees was unreasonable and so radically material as to terminate the contract for the construction of the dam, and give the contractor a right to recover in *quantum meruit* for the value of the work done, was one of fact; and the finding that such change was a reasonable alteration under the terms of the contract was supported by the evidence.

[3] ID.—ABANDONMENT—NATURAL OBSTACLES—CHARACTER OF ORDER FOR CHANGE IN WORK.—In such action, the contractor was not absolved from his contract by the natural obstacles intervening in the construction of the dam, unless they rendered performance practically impossible; nor was the order by the owner to quit work on the straight line axis and proceed on the angle of 44 degrees an order to quit work on the dam.

[4] ID.—ORDER FOR CHANGE IN WORK—ESTOPPEL—EVIDENCE.—In such action, the contractor is not in position to question the order by the owner to change the dam from a straight line axis to an angle of 44 degrees, where the contractor not only suggested the change, which was adopted by the owner, but agreed to and accepted the order given him to complete the structure in that way; nor can the contractor complain that no written instruction was received by him to effect such change, where he agreed to wait for the order in writing from the owner to do the work until the Railroad Commission should give its consent for the location of

the work within the new lines, and later, when asked if he would proceed provided the written order was given, he said he would not continue work under the contract at all.

[5] ID. — ALTERATIONS IN WORK — WRITTEN ORDER — PROVISION FOR BENEFIT OF CONTRACTOR—WAIVER.—The provision in the contract that the owner should direct alterations and substitutions in the work only by written order was for the benefit of the contractor and could be waived by him.

[6] ID.—REQUESTED FINDING—APPEAL—ESTOPPEL.—In such action, the contractor is estopped on appeal from challenging the finding that he accepted and acted upon the verbal order to cease to perform further work in and about the construction of the dam on the straight line axis, and to complete the work on the angle of approximately 44 degrees, where he expressly requested such a finding and it was made by the trial court at his instance.

[7] ID.—ALLEGED BREACH BY OWNER—EVIDENCE.—In such an action, the contention of the contractor that the owner, by serving notice of election to take over the equipment of the contractor and by commencing the instant action to restrain the contractor from removing such equipment, breached a subsisting contract is not sustained by the evidence.

[8] ID.—REFUSAL BY CONTRACTOR TO PERFORM—EVIDENCE.—In such an action, the contractor's definite and oft-reiterated declarations that he considered the contract terminated, after he had accepted the owner's order to change the axis of the dam, which alteration was found to be a reasonable one, can only be regarded as amounting to a clear, unequivocal, and absolute refusal to perform.

[9] ID.—CHARGE OF EQUIPMENT—INJUNCTION—CONSTRUCTION OF CONTRACT.—The provision in the contract that "if the contractor fails to diligently prosecute said work in every particular, or if he shall abandon the work, or any part thereof, or shall fail in any way to perform the conditions of this agreement on his part to be performed, or shall become insolvent, or make an assignment or commit an act of bankruptcy, the company shall have the right, if it so elect, to take over all tools, equipment and supplies of the contractor . . . and proceed to complete the work," constituted ample authority for the company (the owner), upon abandonment of the contract by the contractor, to serve notice of election to take over the tools, equipment, and supplies and to restrain the contractor from removing them.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. E. P. Shortall, Judge. Affirmed.

The facts are stated in the opinion of the court.

Edgar C. Chapman and R. P. Henshall for Appellant.

Pillsbury, Madison & Sutro, Max Thelen and Oscar Sutro for Respondent.

WASTE, J.—The defendant was engaged in the work of constructing a large cement dam for the plaintiff under a contract by the terms of which, in the event of abandonment of the work by the contractor, plaintiff might take over all tools, equipment, and supplies of the contractor and proceed to complete the structure. Alleging that the defendant had notified it that he declined further to proceed with the performance of his contract and was about to remove the equipment from the work, plaintiff brought this suit to restrain such threatened action. A restraining order was granted, and by stipulation was continued as a temporary injunction. Defendant took the position that the contract had been terminated by an act of the plaintiff. He filed counterclaims and a cross-complaint for the recovery of $873,625, alleged to be the balance due for the reasonable market value of all of the work done at the dam, after crediting plaintiff with the sum of $1,060,825 paid, computing said balance on the basis of the cost of all the work done plus ten per cent. The trial court found that the defendant had in fact abandoned the contract. Judgment was rendered against the defendant on his counterclaims and cross-complaint, and plaintiff was awarded its costs. No order was made for the continuance of the injunction, since plaintiff had completed the construction of the dam before the determination of the action. This appeal by the defendant followed.

On December 15, 1919, the plaintiff entered into a contract with the defendant for the construction by the latter of a concrete dam across the South Eel River, on a site mentioned in the contract, at the lower end of Gravelly Valley, in Lake County. According to the plans and specifications, the work was to be done within certain delineated and designated lines extending from the north to the south bank of the stream. Prior to entering into the contract, defendant, with his engineers, made a thorough investigation of

the dam site, and, in the contract, he agreed to take the ground as he found it. The agreed price for the work called for by the plans and specifications was $1,122,350, with adequate provision for prices and payment for all kinds of additional work which might arise in view of the nature of the construction. It was contemplated by the parties that occasion might arise for a departure from the work designated in such plans and specifications, and the contract provides:

"The Company shall have the right to make, but only by orders in writing, such reasonable alterations, omissions, additions or substitutions in said plans and specifications as the Company may deem necessary. The Contractor agrees to accede to and carry into effect all such alterations, omissions, additions or substitutions as though they were originally provided for in this contract.

"In the event of such alterations, omissions, additions or substitutions increasing or decreasing the cost of constructing the said dam there shall be added to, or subtracted from, the amount which the Company has agreed hereby to pay to the Contractor for the entire work, a sum equal to the difference between the actual cost of the materials and labor entering into such alterations, omissions, additions or substitutions, but not including any portion of the time of the superintendent or office employees, or overhead expenses, except industrial insurance, plus twelve and one-half per cent as the Contractor's profit, and the same cost estimated in the same way of the work or construction which would have been done under the plans and specifications made a part of this contract, had there been no such alterations, omissions, additions or substitutions."

It was stipulated in the contract that the defendant should begin work not later than January 1, 1920, and should have all concrete poured and the dam ready for use in storing water on or before December 1, 1920, and all additional work done and the dam entirely completed on or before February 1, 1921. Immediately upon the execution of the original agreement the defendant commenced the work of constructing the dam. The state Railroad Commission exercised jurisdiction over the work, paying particular attention to the exposure of satisfactory foundations for the construction of the dam before any

concrete should be placed thereon.   On May 25th defendant was ordered by the consulting engineer of plaintiff in charge of the work to, and he did, change the axis of the dam as shown on the plans and specifications by moving the northerly end thereof westerly 25 feet, for the purpose of avoiding unsatisfactory material.   Shortly thereafter, and for several months, defendant was in continual need of financial assistance.   On various occasions he applied to the plaintiff, and was furnished by it with sufficient funds with which to proceed with the work.   In June, at defendant's request, plaintiff extended the time within which the defendant was to have all concrete poured and the dam ready for use in storing water, to October 1, 1921, and the time within which all additional work should be done and the dam entirely completed, to December 1, 1921.

Defendant's original plan of work was to build the dam from both banks of the river toward the center, but work was prosecuted more diligently on the north end of the structure than on the southerly side.   The trial court found that the delay in completing the work at the southerly end of the dam was not caused by any acts of the plaintiff. The real reason for the concentration of work on the northerly end of the structure seems to have been that work at that point was done more easily, and that the pouring of cement could progress more rapidly.   The defendant testified that he expected the progress payments at five dollars a cubic yard for concrete poured to carry the expense of the work.   When defendant finally began work of excavation for the foundation on the south side of the river, difficulty of construction was experienced by reason of the nature of the ground.   On October 28, 1920, the axis of the dam was accordingly changed, so that from a point about 590 feet from the northerly end of the structure it would be constructed at an angle of 32 degrees from such point to a large boulder 75 feet high lying on the south side of the river.   Defendant was directed to make this change, and to construct a ring of cement and a cutoff wall under the boulder and into the hard rock beyond.   This change was considered a more economical and quicker way of building the dam than by completing it on the straight line axis, because of the nature of the ground and the material to be moved.   Defendant accepted

and was working under these changed conditions in November, 1920, when torrential rains caused a heavy flood which washed away a large part of the material remaining to be excavated at the south end of the dam and undermined and moved the large boulder referred to some 35 feet out of position. This condition of affairs caused a change of plans which would not have been necessary had the boulder been imbedded in concrete, as was contemplated, or had the full force of the flood not been directed against the south bank by the completed portion of the dam in such manner as to undercut the rock. Engineers testified on the trial that proper methods of construction would have required that the sides of the foundation of the dam should have been excavated first, and the dam built from both ends toward the center, leaving an opening or low point which would have permitted the floods to pass through without damage.

In view of the changed conditions created by the floods, plaintiff verbally ordered the defendant to complete the dam on an angle of approximately 30 degrees. He proceeded with work under said verbal order, and, amongst other matters, constructed a rock wall as part of said work, all under the contract of December 15, 1919. In the latter part of December, owing to the lateness of the season, work was practically shut down until February, 1921, when the defendant notified plaintiff that he would proceed with the construction of the dam under the order of October 28, 1920, unless otherwise ordered. In the meantime, the Railroad Commission approved a plan to return to the straight line axis, and the defendant was ordered in writing to carry out the work on that line. He agreed to do so if work "beyond the lines called for by the original contract" should be paid for under the clause in the original contract providing for alterations, omissions, additions, or substitutions in the work. The plaintiff answered that it stood upon the terms of the contract. Meanwhile a controversy arose between the contractor and the company as to the most feasible manner and best method of completing the dam. The plaintiff advocated and had ordered completion on a straight line axis. The defendant had agreed to go ahead, but insisted that the work be completed on an angle of approximately 44 degrees to avoid the slide caused by

the flood, and to run to a buttress rock west of the straight line axis. His opinion prevailed, and on May 21, 1921, he was verbally directed by plaintiff to cease work on the straight line axis and complete the dam on the 44-degree angle. The trial court found that completion of the work on the straight line axis was possible, but not practicable, by reason of the excessive cost which would have been incurred if that course had been followed. By the time the parties agreed to this change in plan of construction all the material required to be moved by excavation at the south end of the dam upon the straight line axis, as specified on the plans, had been removed. It was now agreed that the exact line of such new angle could not be determined until the foundations upon which the dam would be constructed were exposed, at which time application would be made to the Railroad Commission for authority to proceed along the new lines, and written order given defendant to proceed. Defendant consented and agreed to all these matters. Thereupon he was directed to do certain exploratory work for the purpose of determining the exact location of the new foundation line. In the meantime, defendant's financial backers had become interested in the matter. They questioned whether or not such exploratory work fell within the terms of the contract. The defendant asserted that it did not. Although he had done, and had been paid under the contract for, similar work, he consented to sink certain test pits, but refused to concede that such work came under any of the contract provisions. His attorney advanced the further contention that the unexpected flood had terminated the contract, and declared that it was useless to look to it for any purpose whatever. He wrote to the plaintiff: "The work will have to be done under a new contract." The defendant would, he added, finish the work under the orders of the company at cost plus 12½ per cent. The plaintiff all the while took the position that the contract was still in force and that all work came under its provisions.

Much correspondence passed between the contractor and the company relating to the work and the manner in which it would be paid for. The defendant was constantly demanding from plaintiff an interpretation of the contract as to method of payment, if he proceeded with construction

on the 44-degree angle. The plaintiff steadfastly stood upon the terms of the agreement. It notified defendant that a refusal or neglect to perform work thereunder would be taken as a repudiation and breach of the contract entitling it to proceed as it might choose. On June 8th defendant again insisted upon a construction of the contract as to how he was to be compensated for such excavation as might "be necessary to be done in the event the dam is to be completed on a straight line axis," while admitting in the same letter of his attorney that orders had already been issued to him to stop work on the straight line axis and to continue the work on the angle of 44 degrees. He took the position that the contract, if it did still exist, did not require him to proceed on a straight line axis, and declined to admit that such work was called for by the contract, or that it was extra or additional work arising under the contract, or had anything to do with the contract. Under the circumstances, he said, he declined to proceed further upon the dam, and would remove his equipment forthwith and shut down the work. Instructions were forwarded by him to his superintendent at the dam to take such steps. The controversy between the parties was continued. The defendant offered several propositions looking to a settlement of his claims for payment. The plaintiff rejected all of them upon the ground that they were not based upon or measured by the terms of compensation contained in the contract. Defendant, having in the meantime notified plaintiff "in order that there might be no misunderstanding" that he would "not perform work on the angle of the dam under the unit price provision of the contract, or under the provision relating to omissions, alterations, additions, or substitutions," on the ground that the character of the work was different from that pertaining to any other portion of the dam, was exceedingly difficult, and not within the contemplation of the parties to the contract when it was entered into, on June 30th served on the plaintiff a demand for the payment of $754,633. This amount he stated he was willing to accept in full for all work done on the Scott dam under the contract of December 15, 1919, and for work done outside of and extraneous to the contract to May 1, 1921. He rendered a separate bill for the month of May. These bills were computed on

the cost plus basis for all work done by defendant and were demanded as an additional payment over and above the sums which had already been paid to him by plaintiff under the terms of the agreement. In short, it was another declaration on the part of defendant that he regarded the contract as breached by plaintiff, and that he was entitled to recover the reasonable value of all work done. Immediately after service of this demand, plaintiff instituted this action and procured the restraining order It took over the equipment at the dam, and finished the work, at a cost of $694,450 over what it had already expended.

The large sums of money involved in this action, and its consequent importance to the parties, led to a minute and comprehensive presentation of the case in the lower court. The trial judge visited and inspected the dam and the premises involved in the action. The evidence taken at the trial, which lasted many days, was brought here in a reporter's transcript of more than 3,000 pages; the points and authorities of the respective parties cover many hundreds of printed pages, and the case was orally argued at length. Counsel, with indefatigable industry, have raised and presented their contentions from every conceivable point of view. Every point raised or remotely suggested by either side has received attention and consideration from the opposing side. Viewed, however, from any and every angle, the appeal presents but one question: Was the contract entered into between the plaintiff and the defendant for the construction of the dam terminated by agreement of the parties and the resulting order given by plaintiff to defendant on May 21, 1921, to complete the dam on an angle of 44 degrees? From our examination and understanding of this voluminous record, we are convinced that the contract was not so terminated and that the finding of the trial court that the defendant abandoned the contract is amply supported by the evidence, and that the judgment must be affirmed. The findings are not attacked beyond a suggestion that they are in part contradictory as to the question of abandonment. As appellant expressly states in his opening brief that "no reversal is sought upon that ground," we will consider the point no further.

In support of the appeal, the appellant contends that it was not he but the respondent who breached the contract. On the facts found he contends judgment should have been in his favor. In short, his position is that as the contract between the parties called for the construction of a dam upon a straight line axis between defined lines, and between definite points on the north and south banks of the river, the notification given by respondent on May 21st to quit work on the straight line axis was, in itself, a termination of the contract, and such a breach on the part of the company as to entitle the contractor to recover the reasonable value of all the work done.

Appellant's argument is that the proposed change to the 44-degree angle was unreasonable, and was such a radical change in the nature of construction that it could not have been supposed to have been in the minds of the parties at the time the agreement was entered into. The proposed change was unreasonable, he insists, because the required amount of excavation to be done by reason of the change was not bid upon by him, and the ground to be excavated was physically of a different character, more difficult and more costly to excavate. The trial court found that the completion of the dam on the angle of 44 degrees was the most economical, practical, and efficient method of completing the structure, and was a reasonable alteration of the contract plan. The evidence amply establishes the fact that it was more feasible, cheaper, and better to build the dam on the angle rather than on the straight line, and was a reasonable alteration of the original plans and specifications. It will be recalled in this connection that it was the appellant who first advocated that the work be completed on the angle of 44 degrees, in order to avoid the slide caused by the flood.

The whole course of dealing between the parties tends to destroy the contention of appellant. One of the noticeable features throughout the contract is the evident intention of the parties to vary the plan of construction of the dam if it were found beneficial or necessary. The essential feature of the contract was the construction of the dam. It is obvious that in a work of the nature and magnitude of the proposed construction, the highest engineering skill, even when exercised with utmost care, could not

learn in advance all the physical conditions to be met with during the progress of the work. Those to whom the undertaking was entrusted, even with the aid of expert engineers, could not be expected to know in advance all along the line of operations what Nature had placed beneath the surface of the earth in the form of obstacles to construction. Alterations and changes, many slight and some substantial, would almost inevitably be required at certain points in a work of such nature. Prudence on the part of those in charge would compel them to make provision for such contingencies as could not be foreseen with ordinary care and prudence. This was the object of the clause inserted in the contract, which should be so construed as to effect its important purpose. The various alterations ordered by the respondent and carried out by the appellant without objection, and the final change ordered to be made from a straight line axis to the angle of 44 degrees, were all in conformity with changing conditions. [1] If reasonable, they were clearly within the scope and object of the contract and the plan. (*Kinser Const. Co.* v. *State,* 204 N. Y. 381, 394 [97 N. E. 871]; *Kingsley* v. *City of Brooklyn,* 78 N. Y. 200; *Daly* v. *Busk Tunnel Ry. Co.,* 129 Fed. 513 [64 C. C. A. 87]; *Philadelphia etc. R. R. Co.* v. *Howard,* 54 U. S. (13 How.) 307, 341 [14 L. Ed. 157, see, also, Rose's U. S. Notes].)

In order to furnish contractors with bases for their bids for building the dam, it was necessary to assume certain quantities and lines. Appellant offered to do the work called for within these lines for a definite amount. For additional work within these lines, which the drawings on their face showed might be necessary, but the full extent of which could not be determined until the work progressed, he was to be paid at the unit prices fixed in the contract. But if the work fell outside the lines of the plans, he was to be paid cost, plus 12½ per cent for profit, excluding overhead expense, for such extra work. The contract itself thus making specific provision "for additional depth of excavation beyond that specified," and "for additional concrete work over the dam as specified," and "for reasonable alterations, omissions, additions or substitutions," tends further to support the view that the parties had the conditions which subsequently arose in their minds at the time

of entering into the agreement.   The practical interpretation of the parties placed upon the contract also shows clearly that the different changes in the axis of the dam were regarded by them as alterations under the terms of the contract.   Soon after the work was commenced it became apparent that it would be more economical and advantageous to complete the remaining portion of the dam on an angle rather than- on a straight line axis.   On May 25, 1920, and again on October 28th of the same year, during construction, as previously noted, orders were given to the appellant, and acted on by him, to change the axis of the dam to an angle with its original position.   These changes were made and carried out under the contract.   Appellant accepted these orders and never questioned the respondent's right to make such material alterations in the plan of work.   After the flood of November, 1920, the respondent directed the appellant to return to the straight line axis of June 7, 1920, which direction the appellant accepted, and proceeded with the work.   The evidence also indicates that it was the understanding of the appellant at the time the contract was entered into that the axis of the dam might be moved.   At the very inception of the work, he built the trestle work from which the concrete was poured into the foundation in such position that, if a change was made in the location of the axis of the dam, it would not interfere with such temporary construction.

By his cross-complaint the appellant sought to recover from respondent the difference between the contract price for the work and cost to him plus 10 per cent.   [2]   The question whether or not the change from a straight line axis to an angle of 44 degrees was unreasonable and so radically material as to terminate the contract for the construction of the dam, and give appellant a right to recover in *quantum meruit* for the value of the work done, was one of fact.   (*Tribble* v. *Yakima Valley Transp. Co.,* 100 Wash. 589, 595 [171 Pac. 544]; *Annapolis etc. Co.* v. *Ross,* 68 Md. 310, 319 [11 Atl. 820].)   The trial court has not only construed the contract as a matter of law contrary to appellant's contention, but has also found, with ample support in the evidence, that the change ordered was a reasonable alteration under its terms.   [3]   Appellant was

not absolved from his contract by the natural obstacles intervening, unless they rendered performance practically impossible. Mere difficulty, or unusual or unexpected expense, would not excuse him. (*Carlson* v. *Sheehan,* 157 Cal. 692, 697 [109 Pac. 29].) Respondent was willing at all times, and, so far as we are able to judge from the record, able to pay for all work measured by the terms of the contract. The order to quit work on the straight line axis and proceed on the angle of 44 degrees was not an order to quit work on the dam.

[4] For another reason, appellant is not in position to question the order of May 21, 1921. The record is uncontradicted that he not only suggested the change from the straight line axis to an angle of 44 degrees, which was adopted by the respondent, but agreed to and accepted the order given him to complete the structure in that way. Appellant began exploratory work for the purpose of locating the foundations for the dam within the new lines. The answer to his contention that no written instruction was received by him is that he agreed to wait for the order in writing from the respondent to do the work until the Railroad Commission should give its consent for the location of the work within the new lines. Later, when asked if he would proceed provided the written order was given, he said he would not continue work under the contract at all. The law does not require an idle act. (Civ. Code, sec. 3532.) [5] The provision in the contract that the respondent should direct alterations and substitutions in the work only by written order was for the benefit of the contractor and could be waived by him. (*Enterprise Hotel Co.* v. *Book,* 48 Or. 58, 64 [85 Pac. 333]; *Cowles* v. *United States Fidelity & Guar. Co.,* 32 Wash. 120, 126 [98 Am. St. Rep. 838, 72 Pac. 1032].) [6] The finding that the appellant accepted and acted upon the verbal order to cease to perform further work in and about the construction of the dam on the straight line axis, and to complete the work on the angle of approximately 44 degrees, was expressly requested by appellant, and was made by the court at his instance. He is now estopped from challenging a finding made at his request. (*National Loan & Inv. Co.* v. *Rockland Co.,* 94 Fed. 335, 336 [36 C. C. A. 370].)

We deem it unnecessary to go into a consideration of the question suggested by the appellant that the grammatical construction placed by the respondent upon the clauses of the contract relating to payment would have ruined the contractor, and the counter-suggestion of the respondent that the appellant would have benefited by the construction of the dam on the 44-degree angle, and would have received a substantial profit. As the trial court found, upon sufficient testimony, that the alteration of the plans was reasonable, we need not enter upon a discussion of the exact measure of compensation which might have governed had other conditions been found to exist.

[7] Appellant contends that when the respondent served notice of election on June 30, 1921, whereby it elected to take over the equipment of appellant, and followed that notice by commencing this action and obtaining an injunction restraining appellant from continuing the work, which, he alleges, he was then doing under the contract, it was the respondent and not appellant that broke the agreement between the parties. He argues that there was never any threat on his part to quit the work, except a conditional threat which he asserts is meaningless in law, and which he also maintains he had a right to make, for it involved a mere proposition of compromise on his part. These considerations derive importance, he asserts, because of the fact that he did not abandon his contract but remained at work, and that, therefore, respondent's election to take over the equipment and the institution of the suit for a restraining order were a breach by respondent of a still valid and existing contract. We are not impressed with appellant's argument on this point. It would have more convincing weight if he had not so readily contented himself with the situation at the time. He made no effort on the hearing of the order to show cause to show that the restraining order had been improvidently granted, or to resist the granting of the temporary injunction which only went to the length of preventing him from removing his equipment and supplies from the dam and from interfering with respondent in taking over and using the same. He stipulated that it be granted. The reason he did so is quite apparent. He himself had declared the contract "dead." His contention was that any further work would

have to be done as under a new contract. He had notified his foreman to take steps to shut down the work. The force of men he maintained at the dam was seemingly small for properly carrying on the work, if he intended in good faith to proceed. The officers of the respondent company were out of the state. For that reason appellant had agreed, so he represented, to keep his outfit at the dam. He was possibly hoping for a favorable consideration of his proposals upon their return. These proposals were for payment for the work on a basis different from that provided in the contract, and respondent was not required to consider them. Appellant had declined to proceed under the contract. His refusal was to continue the work on the angle of the dam under the contract. [8] The trial court has found that such work was a reasonable alteration or substitution provided for and included in the contract. Appellant had accepted the order to do such work, and his definite and oft-reiterated declarations that he considered the contract terminated can only be regarded as amounting to a clear, unequivocal, and absolute refusal to perform. (*Woodman* v. *Blue Grass Land Co.*, 125 Wis. 489, 493 [103 N. W. 236, 104 N. W. 920, 921].)

[9] The clause of the contract giving respondent authority to take over appellant's equipment and to proceed to complete the dam provides that "if the contractor fails to diligently prosecute said work in every particular, or if he shall abandon the work, or any part thereof, or shall fail in any way to perform the conditions of this agreement on his part to be performed, or shall become insolvent, or make an assignment or commit an act of bankruptcy, the company shall have the right, if it so elect, to take over all tools, equipment and supplies of the contractor . . . and proceed to complete the work." There was ample authority in this provision for the respondent to proceed as it did. The appellant constantly claimed that the contract was terminated on May 21st because the order given him to complete the dam on the angle was unreasonable in that it called for work for which he claimed he would not be properly compensated, and that, therefore, the contract was terminated on that date. Having gone thus far, appellant is not in position to advance the inconsistent claim that the contract was in force at the time of the issuance of

the restraining order, and that performance on his part was prevented by the respondent, and not by any act of his.

The trial court found that on June 23d and continuously thereafter the appellant was insolvent. The respondent contends that it was an implied term of the contract that appellant would not permit himself, through insolvency, to be disabled from performing his contract, citing *Central Trust Co. of Illinois (Trustee in Bankruptcy)* v. *Chicago Auditorium Assn.*, 240 U. S. 581 [60 L. Ed. 811, L. R. A. 1917B, 580, 36 Sup. Ct. Rep. 412, see, also, Rose's U. S. Notes]. For this reason, it argues, it was justified in taking over the equipment. Whether this be so or not, or whether the insolvency of appellant prevented his completing the contract, it is unnecessary to decide. What we have already said disposes of the meritorious issues raised by the appeal.

The judgment is affirmed.

Kerrigan, J., Lennon, J., Seawell, J., Lawlor, J., Myers, J., and Wilbur, C. J., concurred.

Rehearing denied.