[Civ. No. 5873.   Fourth Dist.   Oct. 10, 1958.]

STANDARD IRON WORKS (a Corporation), Respondent, v. GLOBE JEWELRY AND LOAN, INC. (a Corporation) et al., Appellants.

Edgar B. Hervey, James Edgar Hervey and Henry F. Walker for Appellants.

Stickney & Stickney, Edward Strop and Benjamin W. Hamrick for Respondent.

GRIFFIN, P. J.—Plaintiff-respondent Standard Iron Works, a corporation (hereinafter referred to as Standard) brought this action for damages against defendants and appellants Globe Jewelry and Loan, Inc., a corporation (hereinafter referred to as Globe), Globe Properties, and Harold Steckel, for claimed breach of contract. It was stipulated at the trial that in all dealing by defendant Steckel he was acting as agent and as an officer of defendant Globe and Globe Properties, and that said businesses were owned by Steckel and his wife.

Plaintiff corporation is engaged in the structural steel fabricating business in San Diego. Defendants owned unimproved property at the northwest corner of Fifth and Date streets, and in the latter part of 1955 they contemplated constructing a three-story office building thereon. They employed a Mr. Wheeler, an architect, to prepare architectural drawings for such a building, and he in turn employed one Ruskin, a structural engineer, to prepare the structural drawings. In January, 1956, these plans and drawings, providing for a three-story steel frame building with concrete basement were released for bid to certain general contractors, including one C. S. Larsen, who was the lowest bidder. Plaintiff had previously been furnished with the architectural and structural drawings for bidding on the steel work.

On February 10, 1956, when it was still contemplated by defendants that a general construction contract would be let to Larsen, a meeting, wherein Mr. Ruskin, Larsen, Steckel and his wife, one Seltzer, attorney for defendants, and one Dearth, vice president and representative of plaintiff were present, was held for the purpose of obtaining a contract for the structural steel necessary for the building. At that time there existed a steel shortage, and a threatened strike in the steel plants. Defendant Globe had a lease agreement with an insurance company to lease one-third of the floor space of the building, when completed, with a deadline of June, 1956. Its loan-

ing agency required that at least 70 per cent of all space be leased by that time. Dearth had been requested by Larsen to attend this meeting. Based upon the architectural and structural drawings he was asked to submit two separate prices for the steel contract, one price for three floors and the other for two floors. Expecting that the contract would be entered into with Larsen as general contractor, plaintiff's proposal (Exhibit 1) was originally made out for Larsen's acceptance. At the meeting Dearth then learned that Larsen had not, as yet, been given the general construction contract. Apparently Steckel was reluctant to sign plaintiff's proposal but because of the urgency for commencing construction of the building, and to be assured that the steel would be available as needed, he did, upon the advice of his counsel, sign the proposal at this meeting. Although Dearth claims that after he arrived he heard nothing about uncertainty in securing a loan to finance the entire contract, it appears that the question did arise. The necessity of obtaining the steel for a three-story building was uppermost in their minds and a conversation ensued as to the proper method of obtaining it. Apparently defendants agreed that plaintiff could go into the open market and obtain it at warehouse prices (a higher price) rather than at the mill (at lower prices with considerable delay in filling orders) and that plaintiff was authorized by the agreement signed to do so.

The only question which remained in any doubt was a possible oral change in their plans as to whether plaintiff would proceed with the contract on the agreed basis of a three-story building or on the basis of a two-story building, and whether defendants were to notify plaintiff of their election "within a few days" (two or three). There is considerable confusion in the evidence on this subject and it is one of the principal arguments of defendants that the contract was uncertain and indefinite because defendants never informed plaintiff of their election, and that accordingly the contract (Exhibit 1) could not be a basis for a cause of action for claimed breach since its effectiveness was conditioned upon defendants' determining "within a few days" whether a two-story or a three-story building was to be erected. They cite such authority as *Autry* v. *Republic Productions, Inc.*, 30 Cal.2d 144, 151 [180 P.2d 888]; *Avalon Products, Inc.* v. *Lentini*, 98 Cal.App.2d 177, 179 [219 P.2d 485]; *Talmadge* v. *Arrowhead Reservoir Co.*, 101 Cal. 367 [35 P. 1000]; *Lawrence Block Co.* v. *Palston*, 123 Cal.App.2d 300, 308 [266 P.2d 856]; and

*Mainieri* v. *Magnuson,* 126 Cal.App.2d 426, 428 [272 P.2d 557].

The original contract (Exhibit 1) reads in part as follows:

"STANDARD IRON WORKS

. . . . . . .

"PROPOSAL   Date February 10, 1956
"Estimate No. 9374 — 1 & 2
"Job Globe Properties
"Architect R. G. Wheeler and
      John Ruskin

Globe Properties, Inc.

"To   ~~C. A. Larsen~~   228 Broadway
"~~2057 Kurtz~~        D. G. Dearth
"San Diego, California

"We agree to furnish, subject to the conditions on reverse side of this proposal:
"Structural steel framing on the following basis:
"3 Floors steel framing, no basement . . .
    Erected in place   Tax included sum of $56,400.00
"2 Floors steel framing, no basement . . .
    Erected in place Tax included sum of   43,871.00
"These prices are based on quick delivery and all material coming from warehouses as source of supply.
"The foregoing pre-architectural sheets 1-9
    dated 1/11/56;   structural sheets S. — S"
    dated 1/11/56 prepared by R. G. Wheeler
         (Signed) D. G. Dearth

"Terms:  Progressive monthly payments, Net, 10th of month following date of invoice.

"I (we) hereby accept the above Proposal this 10 day of Feb., 1956.

                        "STANDARD IRON WORKS
                        "By Don G. Dearth
                        "Sales Manager
"Globe Properties
"By Harold Steckel, Secy."

The conditions referred to, on the reverse side of the proposal, are:

"This proposal contemplates the furnishing of steelwork in

strict accordance with and by the conditions and terms of the specifications and code of standard practice as adopted by the AMERICAN INSTITUTE OF STEEL CONSTRUCTION.

"All agreements are contingent upon strikes, accidents, delays of carriers and other delays unavoidable or beyond our control. All quotations are made for prompt acceptance and are subject to change without notice.

"When erection is included, the purchaser shall provide adequate foundations of proper height, shall set anchor bolts, and shall establish all levels and datum lines.

"By erection (when included) is meant the setting in place of the Structural Steel proper but does not cover the placing of Lintels or other material weighing less than 500 pounds, nor the setting of wall plates, anchor bolts, pipe railing, work of a similar nature, or other setting of material not stipulated in this proposal.

"Purchaser agrees to notify the seller when the building is to be ready to receive steelwork and also to have the building ready at the time stated.

"This proposal expires in 30 days.

"No charges for labor or material furnished by the purchaser shall be allowed as a credit on this agreement, unless authorized in writing by the Standard Iron Works.

"All payments shall be made as stipulated and are payable at the office of Standard Iron Works. When not so paid, then the entire contract price shall become due and payable.

"This proposal, when signed by the purchaser or his duly authorized representative, implies an acceptance of the above conditions and terms, and the proposal becomes a contract in full force and effect, subject to the approval of the Standard Iron Works."

It should be noted that the contract, instead of being with C. A. Larsen was changed to Globe Properties, Inc., during the meeting, with the consent of the parties because Larsen had not yet been awarded the general contract. It should also be noted that through the advice of defendants' counsel, there was written across the face of it: "The foregoing pre-architectural sheets 1-9 dated 1/11/56; structural sheets S. — S" dated 1/11/56 prepared by R. G. Wheeler." These sheets and general plans referred to are in evidence and show a general and detailed plan for a three-story building, and there is no alternative indicated. The acceptance of this contract, which by reference included the accompanying plans, suffi-

ciently established a binding contract in accordance with its terms, subject to the possible delay of two or three days in determining whether it should be a three-story or a two-story structure.

In respect to this subject Dearth testified that at the meeting of February 10 it was "The concensus" (sic) of opinion or "it was stipulated" that it would be a three-story building but at the time they left, the information would be that "they would let us know very quickly.—When I say 'they,' either through Mr. Wheeler or John Ruskin—and they would let us know as to *whether it was going to be a two-story,* but in a very few days, because the tooling would have to be started." (Emphasis added.) On cross-examination the witness testified that "they were to let you know within two or three days whether it was to be a two or three-story building," and that he didn't hear from them one way or the other during that time. The evidence clearly shows that defendants instructed Dearth to proceed with the performance of his contract and obtain the steel at once and that a determination would be made immediately as to the necessary amount to be ordered. Shortly after February 10th Larsen obtained a building permit for the proposed three-story building at defendants' request, and the permit was paid for by defendants. Larsen was authorized to clear the lot and erect barricades. Not hearing from defendants plaintiff, in conformity with the contract, started negotiations with Golden Gate Iron Works of San Francisco to obtain and fabricate the steel for a three-story building, in accordance with the plans referred to in the agreement. Dearth went to San Francisco for this purpose with a work sheet for a three-story building, and ordered the necessary steel. On March 16th, he signed a written contract for it. Golden Gate sent form notices to all steel warehouses in an endeavor to locate sufficient steel. They purchased the necessary steel and reserved it for Standard, under their contract. Golden Gate's engineers took off their own drawings and estimates of fabricated steel required and sent these drawings and estimates to Standard, who in turn delivered them to Ruskin for examination and appraisal. Some changes were made by Ruskin and they were returned to Golden Gate without his approval because Larsen had not, as yet, been selected as the general contractor. During this time Dearth had endeavored to contact Steckel in reference to the approval of the plans of Golden Gate but was told he was out of the city

or not available. A representative of Golden Gate came to San Diego and conversed with Ruskin about the plans. There is testimony by Ruskin that Steckel knew Golden Gate had a subcontract with Standard to furnish and fabricate the required steel for a three-story building which contract was for the price of $42,500, and he was possessed of this knowledge between three weeks to two months after the contract was signed on February 10th. He also testified he discussed this matter with Steckel a dozen times on occasions between said dates. Neither then nor at any time after February 10th did Ruskin or Steckel express any surprise or raise any objections because plaintiff was proceeding in part performance of his contract with defendants pertaining to the fabrication of steel for a three-story building, and no objections were ever made by defendants or their engineers or architect about plaintiff's order being made for a three-story building, as called for therein, and no request was ever made for a two-story building.

It does appear that in the latter part of March, 1956, Dearth did finally get Steckel on the telephone and told him of the demands of Golden Gate for further particulars and for the approval of the plans submitted to Ruskin, and the urgency of the situation in reference to completion within the time limit agreed upon for the completion of the building. He said Steckel then, for the first time, indicated he was having some difficulty in obtaining a loan, and suggested that plaintiff obtain two other bids for a one or two-story building in lieu of the three-story building planned; that he asked Steckel as to the date he wanted delivery on the steel purchased and Steckel said he would let him know in two or three days and that he never did respond; that thereafter he telephoned to Steckel and told him of the seriousness of the situation in respect to delivery and he agreed to meet with Dearth and Steckel's attorney on a day certain; that Steckel's secretary called and said he was out of town; that he notified Golden Gate of the attitude of Steckel by letter dated April 23, 1956, and suggested dissolution of the original plan and an endeavor to negotiate a new one. About June 1, 1956, defendants' attorney called plaintiff and informed it that defendants were having difficulty with financing and although they hoped to complete the building contemplated, they might not be in a position to do so, and suggested that an amicable settlement could be arrived at by the parties under their obligation.

It appears that plaintiff, in response to a request for an extension of time, made an offer to extend the time within which they would proceed upon the condition that plaintiff receive an additional $810 to cover increased labor expenditures. This offer was never accepted.

After some conversations, plaintiff Standard was faced with an action for breach of contract by Golden Gate, seeking damages and loss of profit under their contract. The sum sought was $10,754.19, which included $6,504.19 costs and expenses in part performance and for $4,250 loss of anticipated profits. A settlement with that company was effected just before trial for $6,660.

Plaintiff then retained legal counsel to recover damages against defendants for breach of contract. The trial court found generally that the allegations of plaintiff's complaint were true; that plaintiff, on February 10th, agreed to furnish steel framing for a three-story building, erected in place, in accordance with the plans and specifications indicated, for the sum of $56,400, and defendants promised to pay this amount; that in compliance therewith plaintiff commenced upon the performance of said contract and entered into a written subcontract with Golden Gate for the supply, engineering and fabrication of all steel required for $42,500; that without plaintiff's consent and against its wishes, defendants wilfully prevented plaintiff from further performing its contract, which amounted to a material breach; that plaintiff suffered damage for costs and expenses incurred by its subcontractor Golden Gate in the sum of $6,660, and plaintiff's loss of anticipated profits which it would have received if it had been permitted to completely perform said contract, amounting to $7,290. Judgment was entered accordingly.

The trial judge did give particular consideration to the claim that the agreement was not complete nor effective because two or three days delay was orally granted, in which time defendants could inform plaintiff as to whether it would be a three or two-story building. The evidence, when considered as a whole, might be susceptible of the interpretation that they all agreed on February 10th that a three-story building was contemplated by the agreement, and if there was to be any change to a two-story building plaintiff would be so informed within two or three days and that no such information was imparted. The trial judge in his oral decision, after casting some doubt as to the proper interpretation of

the evidence, stated, in effect, that if he was in error as to that interpretation, there was no doubt in his conclusion that defendants knew that a three-story building was contemplated and agreed upon by the contract, when considered in connection with the accompanying specifications; that defendants knew that if a two-story building was later contemplated they should have informed plaintiff of that fact and failed to do so; that defendants allowed plaintiff to proceed as if a three-story building had subsequently been agreed upon, by taking out a permit in their name for such a building, by examining plans and specifications for structural steel work furnished by the known subcontractor and by allowing plaintiff to proceed without any objection being made about a three-story structure, and accordingly defendants acquiesced in and ratified plaintiff's action in proceeding, to its detriment, in attempting to fulfill the contract respecting a three-story building. We are in accord with these conclusions.

The conduct of an offeree may constitute acceptance. (*Wood* v. *Gunther,* 89 Cal.App.2d 718 [201 P.2d 874] ; *Beatty* v. *Oakland Sheet Metal etc. Co.,* 111 Cal.App.2d 53 [244 P.2d 25] ; 12 Cal.Jur.2d 208, § 18; 12 Cal.Jur.2d 212, § 22.)

The authorities in California are clear that if the reference in a contract to the plans and specifications indicates an intention to incorporate them generally, they become a part of the contract for all purposes. (*Valley Construction Co.* v. *City of Calistoga,* 72 Cal.App.2d 839, 841 [165 P.2d 521] ; 12 Cal.Jur.2d p. 333, § 123.)

The evidence clearly shows that the parties understood they were contracting for steel framing for a three-story building and it was a binding contract to purchase that much steel. It was even offered as a joke at the time of the signing that if defendants did not go ahead with the building defendants would be in the steel business. The facts show defendants clearly authorized plaintiff to proceed with its portion of the building contract at once because of a contemplated steel strike, the rising price of steel, and the urgency to complete the building by June to permit defendants' tenants to take possession. It probably was lack of financial backing that caused defendants to breach the agreement. It is further apparent that plaintiff's proposal to do the job expired in 30 days. Parties should be careful about making contracts, for once made the courts will not relieve them for light or trivial

reasons. ■ Public policy is subserved by leaving the parties and their rights to be measured by the terms of their engagements. They may have made an unfortunate arrangement, but when they have entered into it voluntarily they are bound by it in the absence of equitable grounds for avoidance. ■ They must be presumed to have contracted with reference to existing conditions known to them. ■ Mere difficulty or unusual or unexpected expense will not excuse a party for failing to comply with the terms of his contract. Nor is it a defense that the law has rendered performance difficult or expensive. Defendants were surrounded at the time of the making of the contract by their agents and their own attorneys who then advised them, and no undue advantage of defendants is indicated. They operated under the contract until the financial question arose. ■ Parties to a contract, in all fairness, should be bound by the construction they themselves have placed upon their agreement, particularly where they have acted thereunder for a considerable period of time. (12 Cal.Jur.2d 343, § 131; *Weaver* v. *Grunbaum,* 31 Cal.App.2d 42 [87 P.2d 406].)

■ As to the element of damages, it is a general rule that a contractor may recover his expenses incurred in part performance as well as his anticipated profits upon a completed job basis. (*Buxbom* v. *Smith,* 23 Cal.2d 535 [145 P.2d 305]; Civ. Code, §§ 1512 and 3300; 14 Cal.Jur.2d 664, § 35.) A reasonably substantial basis for such loss of profit and damage was shown and the evidence supports the award. (*McConnell* v. *Corona City Water Co.,* 149 Cal. 60 [85 P. 929, 8 L.R.A.N.S. 1171]; 14 Cal.Jur.2d 665, § 35.)

The offer of plaintiff to extend the time if defendant would pay an additional $800 cannot be said to be a waiver of the breach since defendants did not accept the offer, and it does not appear to have been unreasonable.

Judgment affirmed.

Mussell, J., and Coughlin, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.