[L. A. No. 28824.   In Bank.   Dec. 12, 1966.]

COLEMAN ENGINEERING COMPANY, INC., Plaintiff and Respondent, v. NORTH AMERICAN AVIATION, INC., Defendant and Appellant.

398

Flint & MacKay, Arch R. Tuthill and Philip M. Battaglia for Defendant and Appellant.

Milo V. Olson for Plaintiff and Respondent.

PETERS, J.—Defendant, North American Aviation, Inc., appeals from a judgment awarding plaintiff, Coleman Engineering Company, Inc., damages in the amount of $289,615.89 plus interest at the rate of 7 percent per annum from December 10, 1959. Defendant also appeals from the order denying its motion to vacate the judgment and to enter a new and different judgment.

In January 1959, defendant invited bids for the engineering and manufacturing of 32 positioning or lift trailers and 7 transportation trailers to accommodate its Hound Dog Missile. 'With the invitation to bid, defendant submitted its basic equipment specifications. Section 3.2.2.9 of the specifications contained a description of the "configuration of the payload," namely, "a 36.5 inch dia. cylindrical payload configur-

ation, the longitudinal centerline of which shall coincide with the trailer centerline in the plane of the rail top surfaces.'' References to configuration of the payload are also found in other specifications, namely, a provision dealing with load rails refers to ''payloads of various configurations,'' the intended use provision refers to ''missiles or special payloads for aircraft and missiles'' and a provision designated loaded stability states that part of the payload is ''at a point 46 inches above the rail top surfaces.''

The configuration of the payload is important in the light of the following fundamental engineering principle: The center of gravity ''of an object generally stated is its balance point. It may be considered in three planes—vertical, lateral, and fore and aft. Its location depends generally upon the weight, material and configuration of the object. Its location will vary among objects of the same weight and material if these configurations are different. All these principles are elementary among design engineers.''

All of the engineers testified that, if there were no other specification relating to configuration, an engineer could reasonably interpret specification section 3.2.2.9 as locating the vertical payload center of gravity at rail height. However the expert witnesses of the parties differed as to the effect to be given to the other provisions mentioned relating to configuration of payload. Plaintiff's experts testified in effect that section 3.2.2.9 established the center of gravity at rail height and the further provisions did not establish any other center of gravity. Defendant's experts claimed that the inclusion of the further provisions compelled the conclusion that section 3.2.2.9 does not state the center of gravity, and that instead the specifications must be understood as not stating any vertical location for the center of gravity of the payload.

In February plaintiff submitted its bid to defendant. With the bid, plaintiff transmitted a preliminary stress analysis report which interpreted defendant's specifications as locating the vertical center of gravity of the payload in the plane of the rail top surfaces. This was filed by defendant's engineers but they did not read it.

On June 23, 1959, defendant sent plaintiff five ''go ahead'' telegrams, informing it that it was the successful bidder.[1] Plaintiff then started the design and engineering of the

---

[1]These telegrams limited the liability to be incurred by defendant prior to formal acceptance of the bid.

trailers. On July 6 defendant delivered to plaintiff a series of purchase orders, which, according to the pleadings of both parties, constitute the contract between them. The purchase orders state a total price of $527,632 and provide for delivery of trailers to commence on September 15 and contain the same equipment specifications with regard to configuration of the payload as found in the equipment specifications in the invitation to bid. The purchase orders provided for ''a binding contract on the terms set forth herein when it is accepted either by acknowledgment or delivery.''

The purchase orders also state in paragraph 9, captioned ''CHANGES,'' that ''Buyer reserves the right at any time to make changes in drawings and specifications, in methods of shipment and packaging, in schedules, and the place of delivery as to any material and/or work covered by this order. In such event there will be made an equitable adjustment in price and time of performance mutually satisfactory to Buyer and Seller, but any claim by Seller for an adjustment must be made within thirty (30) days of the receipt of such changes.''

Each purchase order also states that it is the entire contract, that no changes are binding on buyer unless evidenced by a duly executed purchase order, and that buyer may terminate at any time in accordance with section 8-706 of the Armed Services Procurement Regulation. The regulation provides, as applicable here, for payment of expenses and a certain profit to the subcontractor upon such termination.

The president of plaintiff did not sign and return the copies of the purchase orders to defendant until July 15, 1959. Meanwhile, at a meeting of engineers of plaintiff and defendant on July 7, the engineers of defendant stated that it desired the trailers to be designed to accommodate a payload center of gravity 35 inches above the rail top surfaces. When the engineers of plaintiff stated that it had bid on the contract on the basis that the specification placed the center of gravity at rail height and had so indicated in its stress report attached to its bid, defendant's engineers admitted that they had not read that report. Plaintiff's engineers also stated at that time that their work had been based on the assumption of a vertical center of gravity at rail height, that the changing of the center of gravity would entail an increase in costs and a delay in schedule, and that plaintiff desired a change in specifications defining the location of the center of gravity if defendant wanted it at a place other than the top of the load rails. The engineer in charge for defendant requested that work continue

on the trailers and stated that changes in the specifications would be forthcoming.

Several meetings were thereafter held between engineers of the parties, and several proposed changes in specifications were prepared. On October 5, 1959, defendant supplied plaintiff with a telegraphic change in specifications wherein the center of gravity was located at 35 inches above rail height.

The change in specifications caused a significant change in the engineering, design and cost of construction; the increase in costs was at least $257,000. Upon receipt of the telegraphic change of October 5, plaintiff requested an adjustment in price and time for performance before continuing performance. Plaintiff sought recovery of costs expended to the date of the receipt of the telegraphic change and the reasonable expenses of constructing the trailers in accordance with the changed specifications. Plaintiff first sought to raise the contract price to over a million dollars, and also offered as an alternative to change the contractual arrangement from ''fixed-price to fixed-price with redetermination or to a cost-plus-a-fixed-fee at a point to be agreed upon.'' Plaintiff urged that repricing of the contract was essential because of the long delays while waiting for the change order and the numerous starts and stops caused thereby, interim price increases by vendors, changes in the anticipated number of units to be ordered, and the many conferences as to the changes. During these negotiations the position of defendant was that plaintiff had made a mistake by underbidding and was looking to defendant to ''bail'' it out. Defendant refused to pay more than a 10 percent increase in the contract price, an increase of approximately $52,000 which would have raised the contract price to approximately $580,000.

Plaintiff in a letter to defendant took the position that continuation of the contract without obtaining its price for the changes could mean financial disaster to it and that unless a settlement could be reached on the bases it had suggested it would have to stop work on November 5, 1959, and it then would seek recovery under the provision of the contract providing for ''Termination for Convenience.''

Defendant replied that under the purchase orders plaintiff was entitled only to the costs of the changes and that if plaintiff terminated work, the termination would not constitute a termination for convenience but a breach. As a result of subsequent conferences, plaintiff did not stop work on November 5,

but instead submitted a new cost breakdown of the contract as changed. In a letter accompanying this breakdown dated November 10, 1959, plaintiff took the position that it would not agree to arriving at a price on the theory of a comparison between the cost breakdown of every item before the change as compared to a cost breakdown of every item after the change.

The letter explained this position as follows: As to engineering costs, it had from the beginning recognized that a change was necessary and approached the problem of design from that viewpoint, but the exact details of the change were unknown. Because of the necessary stoppages and reanalyzation costs increased, and after the change was made the engineers were required to reanalyze every part going into the trailer to determine whether it had to be changed. As to manufacturing, plaintiff took the position that in making its bid it had obtained price estimates from its vendors, that the bid was based upon these quotations, that because of the impending change order and to save money it was unable to place its orders with its vendors until the change was decided upon, and that in the interim there were changes in prices on a number of articles, including some that were not affected by the change orders.

In this letter plaintiff also offered to permit a government audit office to examine the costs and to abide by its decision. The letter also states that plaintiff will continue its engineering work to completion but will otherwise stop work.

Defendant rejected plaintiff's price breakdown as inadequate and stated that it was willing to negotiate further but that unless plaintiff resumed work by November 18, it would be compelled to conclude that plaintiff had breached the contract and would seek procurement of the trailers elsewhere. After plaintiff refused to continue further without determination of the price for the change order, defendant on November 19 wired that it considered the work stoppage a breach and would seek to procure the trailers elsewhere.

On December 1 and 4, plaintiff made further offers substantially reducing the price based on lower cost estimates and some changes in the design of the trailers. Defendant replied on December 8, that it had placed contracts at another source for the delivery of the trailers and could not consider those offers.

Defendant contracted with another firm for construction of the trailers at a cost of over $800,000, some $28,000 more than the amount of plaintiff's last offer. On March 29, 1960, plain-

tiff submitted to defendant its termination claim of $296,783.03 for expenses incurred in performing the contract.

The trial court determined that the contract was entered into on July 6, 1959, when defendant delivered the purchase orders to plaintiff, that the specifications of the contract place the center of gravity of the payload at rail height, that the engineers of defendant after the conference on July 7 requested plaintiff to continue work and said change orders would be forthcoming, that the change in specifications caused a significant change in the engineering, design and construction of the trailer units which cost at least $257,000, that plaintiff after receipt of the change acted in good faith in seeking an adjustment in the contract price before proceeding further in performance of the contract, that in the circumstances of this case the covenant providing for changes and adjustment of price was not an independent covenant but had to be complied with by the parties before defendant could require plaintiff to proceed with the contract, that the change because of its nature, magnitude and effect, ran to the entire consideration of the contract, that defendant knew that plaintiff's request for an adjustment in price was not unreasonable, that plaintiff and not defendant acted fairly in the negotiations after the change order, that any mistake made during the execution of the contract was a mistake caused by defendant not plaintiff, that plaintiff did not underbid in its initial bid, and that plaintiff suffered damages in the amount of $289,615.89. The court denied recovery on a counterclaim by defendant in which it had sought to recover the difference between the contract price with plaintiff and the cost of obtaining the trailers elsewhere, $381,109.74.

Defendant attacks the determination of the trial court that the contract as originally entered into placed the vertical center of gravity of the payload at rail height. It is also contended that the trial court's finding that the contract came into existence on July 6, 1959, is not supported by the evidence, and that the undisputed evidence establishes that the contract did not come into existence until July 15, which was after defendant's engineers notified plaintiff that the center of gravity would be at a point some 35 inches above the rail height.

It is unnecessary to discuss in detail these contentions because, first, other facts found by the trial court and supported by the evidence require a conclusion that the

contract as originally entered into did not provide for a vertical center of gravity at a point 35 inches above rail height, and, second, it is immaterial whether the contract came into existence on July 6 or July 15.

A contractor who, acting reasonably, is misled by incorrect plans and specifications issued by another contracting party as the basis for bids and who, as a result, submits a bid which is lower than he would otherwise have made may recover in a contract action for extra work necessitated by the incorrect plans and specifications. (Cf. *Souza & McCue Constr. Co.* v. *Superior Court*, 57 Cal.2d 508, 510 [20 Cal. Rptr. 634, 370 P.2d 338]; *MacIsaac & Menke Co.* v. *Cardox Corp.*, 193 Cal.App.2d 661, 669 [14 Cal.Rptr. 523].)

There is nothing in the written specifications or contract which could be reasonably interpreted to require the vertical center of gravity at 35 inches above the rail height, and defendant does not urge that the specifications or written contract so require, but merely claims that the specifications viewed as a whole are ambiguous. Furthermore, even assuming that the inspection of the missile by engineers of plaintiff might indicate that the vertical center of gravity of the payload was not at rail height, the inspection could not be held to require plaintiff, in the absence of further information, to locate the center of gravity at a point 35 inches above the rails or any substantial distance above the rails.

There was no understanding reached by the parties prior to July 15 fixing the vertical center of gravity of the payload at a point 35 inches above the rail height. At the meeting on July 7, defendant made clear its position that it desired such a location, and plaintiff made clear its position that its bid had been based on a vertical center of gravity at rail height, that its stress analysis report had so indicated, that the work so far done had been based on a vertical center of gravity at rail height, and that adjustment to a different height would require substantial changes.

The court found, and the finding is supported by the evidence, that after the July 7 meeting "defendant requested plaintiff to continue working on the project, the subject matter of the contract, and stated that changed specifications would be forthcoming from defendant to plaintiff." It is clear that after the so-called mistake was discovered defendant did not seek to withdraw its purchase orders but to the contrary took the position that performance should continue and *that changes would be made in the specifications.* The purchase

orders, as we have seen, permitted defendant to require changes with a mutually satisfactory adjustment in price and time for performance, and under the circumstances it must be concluded that the contract entered into by the parties did not provide for a vertical center of gravity 35 inches above the rails and that the fixing of the vertical center of gravity at a location satisfactory to defendant was to be accomplished by a change in specifications.

The next question is whether plaintiff was entitled to stop work until an agreement was reached on the price to be charged because of the change order. This question primarily involves the effect to be given to the provisions of section 9 of the purchase orders that defendant may make changes in the specifications and that in "such event there will be made an equitable adjustment in price and time of performance *mutually satisfactory* to Buyer and Seller." (Italics added.)

The general rule is that if an "essential element" of a promise is reserved for the future agreement of both parties, the promise gives rise to no legal obligation until such future agreement is made. (*Ablett* v. *Clauson,* 43 Cal.2d 280, 284-285 [272 P.2d 753]; *City of Los Angeles* v. *Superior Court,* 51 Cal.2d 423, 433 [333 P.2d 745].) "The enforceability of a contract containing a promise to agree depends upon the relative importance and the severability of the matter left to the future; it is a question of degree and may be settled by determining whether the indefinite promise is so essential to the bargain that inability to enforce that promise strictly according to its terms would make unfair the enforcement of the remainder of the agreement. [Citations.] Where the matters left for future agreement are unessential, each party will be forced to accept a reasonable determination of the unsettled point or if possible the unsettled point may be left unperformed and the remainder of the contract be enforced. [Citations.]" (*City of Los Angeles* v. *Superior Court, supra,* 51 Cal.2d 423, 433; *Metropolitan Water Dist.* v. *Marquardt,* 59 Cal.2d 159, 194 [28 Cal.Rptr. 724, 379 P.2d 28].)

Application of these rules to provisions governing change orders in a building contract where the price for the changes is subject to mutual satisfaction is difficult because ordinarily it cannot be determined at the time of entry into the agreement or until change orders are sought whether the provisions governing change orders are or are not an "essential element" of the agreement. It is undesirable to hold the entire

contract unenforceable when there may be no need for change orders or the change orders are insubstantial in relation to the balance of the agreement. On the other hand, where the change orders are substantial in relation to the remainder of the agreement so that the provision for change orders becomes an "essential element" of the contract, it is often unfair to require a party to perform while awaiting a reasonable determination as to price. The change orders may require matters which the contractor may not be equipped to produce except at an unreasonable cost or may require such an increase in costs that progress payments may be essential for the protection of the contractor. The last alternative suggested above, leaving the unsettled point unperformed and enforcing the balance of the contract, would obviously result in unfairness to a contractor where he is compelled to incur substantial expenses as a result of change orders and denied any payment.

Because the relative importance of the change provision of the agreement cannot be known until changes are sought, we are satisfied that the effect to be given to the provision for adjustment of price to the mutual satisfaction of the parties should not be determined merely from the written agreement itself but should depend upon the changes requested. Accordingly, where a provision for changes contains an agreement to agree in the future as to price, the contract is not invalid from the outset, and the validity of the provision for changes depends upon subsequent events. Undoubtedly, if the subsequent changes are minor or of not great magnitude the contractor must perform and obtain a subsequent judicial determination as to the price of the changes. However, where the changes are of great magnitude in relation to the entire contract, the contractor must negotiate in good faith to settle the price (cf. *Comunale* v. *Traders & General Ins. Co.*, 50 Cal.2d 654, 658 [328 P.2d 198] [there is an implied covenant of good faith and fair dealing in every contract]), and where he has done so, he is not required to continue performance in the absence of an agreement as to the price.

Cases relied upon by defendant, such as *Snow Mountain W. & P. Co.* v. *Kraner*, 191 Cal. 312, 316-318 [216 P. 589], are not controlling because change order clauses therein either did not contain a provision that the price of the change would be fixed to the mutual satisfaction of the parties but instead contained a formula for determination of the price (cost plus a percentage of cost) or, if the price was to be fixed by future

agreement, there was also an express provision to continue performance in the absence of the agreement.

In the instant case, the court concluded that the change, because of its nature, magnitude, and effect, ran to the entire consideration of the contract (see *Medico-Dental etc. Co.* v. *Horton & Converse*, 21 Cal.2d 411, 419 [132 P.2d 457]), and that plaintiff acted fairly in its negotiations after the change order. Both of these determinations are supported by the record. For this reason plaintiff was not required to continue performance in the absence of an agreement as to price.

Defendant makes a number of attacks on the amount of damages awarded. Some of these contentions are based on the claim that plaintiff's original bid would have resulted in a loss to it. This contention is without merit. The court found that plaintiff did not underbid, and there is substantial evidence that had the original contract been performed without change, plaintiff would have made a substantial profit.

Defendant also urges that the damages awarded violate subparagraph (e) of section 8-706 of the Armed Services Procurement Regulation (incorporated by reference into the purchase orders), which limits recovery of the seller to the contract price. It is asserted that the damages awarded with regard to two of the purchase orders exceed the contract price of those orders. However, the conduct of the parties and their pleadings show that the purchase orders did not create severable contracts but constituted only a single contract for $527,632. The damages awarded were well below that figure.

Defendant next attacks the award of interest. Section 3287 of the Civil Code provides that any person who is entitled to recover "damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day," is entitled to recover interest thereon.

Aside from any contractual provision, interest is awarded as damages by way of compensation for wrongful detention of money due plaintiff. Of course, the allowance of such interest only occurs when the sum is liquidated within the meaning of section 3287. (*Ansco Constr. Co.* v. *Ocean View Estates, Inc.,* 169 Cal.App.2d 235, 238 [337 P.2d 146].)

It has been held that in a cost-plus building contract the amount due is capable of ascertainment by calculation so that an award of interest for a period prior to judgment is proper. (*Anselmo* v. *Sebastiani*, 219 Cal. 292, 301-303 [26 P.2d 1];

*Maurice L. Bein, Inc.* v. *Housing Authority,* 157 Cal.App.2d 670, 686-688 [321 P.2d 753].) As we have seen, section 8-706 provides as applicable here that the subcontractor shall recover his costs and a certain percentage for profit where the contractor terminates under the power it reserved in the contract. The contract thus provides in effect that payment shall be made on a cost-plus basis, and except for the possibility that certain expenses are not subject to calculation, there does not appear to be any reason to refuse to apply here the rule governing cost-plus contracts generally.

*MacIsaac & Menke Co.* v. *Cardox Corp., supra,* 193 Cal.App. 2d 661, 673-674, relied upon by defendant, does not establish a contrary rule. The basis of damages in that case was the "value" of extra work done under the peculiar circumstances present, and the court pointed out that such circumstances "precluded ascertainment of the cost of the work by computation."

Among the items of expense attacked by defendant are the "Engineering Burden" which is calculated as a percentage of the cost of the engineering labor, the "Material Procurement Burden" which is a percentage of direct materials and outside engineering expense, and the "General and Administrative Expenses" which is a percentage of direct labor and burden. Defendant does not now (and did not at the trial) attack the amounts of these costs or the percentages used. The percentages involved are fixed by government auditors as the share that the project should bear of all of plaintiff's indirect and overhead costs. These percentages are subject to periodic audit by the government and change from time to time. It is apparent that these items of expense are derived by calculation from costs incurred by plaintiff.

Defendant next urges that interest should not have been awarded because plaintiff's original demand of damages exceeded the amount awarded. The approximate net amount of the excess was around $7,000. The reasons for this excess were that after the original demand there was a minor adjustment in the engineering burden percentage, a few matters were omitted from the original demand in error, plaintiff was able to settle some claims of its subcontractors for less than the full amount of the claims, and plaintiff was able to salvage some materials. ▮▮▮ The mere fact that there is a slight difference between the amount of damages claimed and the amount awarded does not preclude an award of prejudgment interest (*Koyer* v. *Detroit Fire & Marine Ins. Co.,* 9 Cal.2d 336, 345

[70 P.2d 927]), and the erroneous omission of a few matters from the account or erroneous calculation of the costs do not mean that the damages are not capable of being made certain by calculation.

With regard to the reduction in damages due to settlement of claims and salvage of materials, it has been held in an analogous situation that offsets of the defendant, even where unliquidated, do not preclude the allowance of interest on the balance of the plaintiff's claim (*Hansen* v. *Covell*, 218 Cal. 622, 629-631 [24 P.2d 772, 89 A.L.R. 670]; *McCowen* v. *Pew*, 18 Cal.App. 482, 483 et seq. [123 P. 354]; see *Lineman* v. *Schmid*, 32 Cal.2d 204, 212 [195 P. 408, 4 A.L.R.2d 1380]), and we are satisfied that reductions in damages due to plaintiff's efforts to mitigate damages should not preclude an award of prejudgment interest. If the rule were otherwise, a plaintiff might be encouraged to forego opportunities to mitigate damages so as not to jeopardize his right to prejudgment interest.

The percentage of profit to be allowed is set forth in section 8-706, and defendant's contention that the profits to be allowed may not be determined by calculation is also without merit.

Defendant also urges that no interest is recoverable on a termination claim under section 8-706. This contention is based on cases which disallow claims of interest against the government. Obviously defendant is not the government, and so the cited cases are not applicable.

There is merit, however, in defendant's contention that the court erred insofar as it awarded interest from the date of termination on the portion of the damages, approximately $18,000, attributable to settlement expenses. Although section 8-706 allows recovery of the cost of expenses reasonably necessary to the preparation of settlement claims, these expenses were obviously not incurred until after the date of termination. Interest is not intended to be a windfall. Interest on this portion of the award should date only from the judgment.

Defendant claims that the trial court erred by failing to make findings on 66 matters although requested by defendant to do so. The counterfindings filed by defendant and its objection to the proposed findings total almost 70 pages. In many respects the counterfindings and objections are directly or impliedly contrary to the findings made by the court, relate merely to evidentiary matters, or deal with immaterial matters. At the end of the counterfindings and objections,

defendant "requests specific findings of fact and conclusions of law on all of the issues, both of fact and of law, which are raised by and which are the subject of and which are included in the Counter-Findings and Counter-Conclusions set forth herein." No other specification was made as to the issues upon which defendant sought additional findings.

We have examined the findings of the trial court in the light of the criticisms made in defendant's brief and are satisfied that the findings sufficiently dispose of all of the basic issues raised. The findings proposed by defendant, insofar as they may be deemed additional findings and are not directly contrary to the findings made, deal with evidentiary matters and, even if the matters therein were found in favor of defendant, would not require judgment in its favor. Section 634 of the Code of Civil Procedure does not require that a finding be made as to every minute matter on which evidence is received at the trial, and under the circumstances the refusal of the court to make specific findings on every matter proposed in defendant's counterfindings does not require a reversal of the judgment.[2]

The judgment should be modified by eliminating the award of interest prior to judgment on the settlement expenses. The trial court is directed to modify its judgment accordingly, and, as so modified, the judgment and order appealed from are affirmed. Plaintiff to recover its costs on appeal.

McComb, J., Peek, J., Burke, J., and White, J.,* concurred.

TRAYNOR, C. J.—I dissent.

In my opinion, the parties attempted to enter into a formal

[2]Section 634 of the Code of Civil Procedure provides:

"In all cases where findings are to be made, a copy of the proposed findings shall be served upon all parties to the action and the court shall not sign any findings therein prior to the expiration of 10 days after such service. The court may direct a party to prepare findings.

"Within 10 days after such service any other party may serve and file objections, counterfindings and requests for special findings.

"If upon appeal or upon a motion under Section 657 or 663 of this code it appears that the court has not made findings as to all facts necessary to support the judgment, or that the findings are ambiguous or conflicting upon a material issue of fact, the court before which such appeal or motion is pending shall not infer that the trial court found in favor of the prevailing party on such issue if it appears that the party attacking the judgment made a written request for a specific finding on such issue either prior to the entry of judgment or in conjunction with a motion under Section 663 of this code."

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

contract and erroneously believed that they had done so. Certain essential elements were left to future agreement, however, and an agreement was never reached.

The majority opinion applies the "essential element" test, long used exclusively to determine the enforceability of agreements to agree, not to determine the enforceability of such an agreement, but to hold that agreement on new terms was a condition precedent to plaintiff Coleman's duty to continue performance under the contract. If there is no initial agreement on essential elements, however, there is no contract to which a condition precedent can attach.

The only enforceable contract between the parties was the one manifested by the five "go ahead" telegrams received and acted upon by Coleman on June 24, 1959. The telegrams contained new proposals and were therefore counteroffers to Coleman's bid. (Civ. Code, § 1585; *American Aeronautics Corp.* v. *Grand Central Aircraft Co.,* 155 Cal.App.2d 69, 80 [317 P.2d 694]; *Lawrence Block Co.* v. *Palston,* 123 Cal.App.2d 300, 310 [266 P.2d 856]; 1 Corbin, Contracts (1963 ed.) § 89, pp. 378-382.) When new terms are proposed, no contract arises unless the original offeror accepts the counteroffer. (*Lawrence Block Co.* v. *Palston, supra; Apablasa* v. *Merritt & Co.,* 176 Cal.App. 2d 719, 726 [1 Cal.Rptr. 500].) If, as here, the offer specifies no particular mode of acceptance and has as its object the beginning of performance, the offeree's beginning of performance constitutes an acceptance. (Rest.2d Contracts (Tent. Draft No. 1) § 52, coms. b, c, pp. 216-218. See *Logoluso* v. *Logoluso,* 233 Cal.App.2d 523, 529 [43 Cal.Rptr. 678]; *Standard Iron Works* v. *Globe Jewelry & Loan, Inc.,* 164 Cal.App. 2d 108, 117 [330 P.2d 271]. Cf. *Beatty* v. *Oakland Sheet Metal Supply Co.,* 111 Cal.App.2d 53, 62-63 [244 P.2d 25].)

The telegrams made clear that final arrangements were still to be made. Pending those arrangements, however, Coleman was to begin operations with the understanding that no more than $40,000 worth of performance was presently authorized. The terms of this agreement included the specifications which, according to the findings, Coleman reasonably interpreted as calling for a payload center of gravity at rail height.

The facts found by the trial court establish that no other contract ever came into being between Coleman and North American. On July 6, 1959, Coleman received from North American the purchase orders referred to in the telegrams. The purchase orders stated that they became a binding

contract on the terms set forth therein when "accepted either by acknowledgment or delivery. . . ." The trial court erred in construing this language to mean delivery of the purchase orders to Coleman and in finding that a contract therefore existed as of July 6.

It is a question of law whether the facts found gave rise to a contract. (*Hunter* v. *Sparling,* 87 Cal.App.2d 711, 721 [197 P.2d 807].) The purchase orders, like the telegrams, contained new and important terms and were therefore a new offer.[1] In such a setting, the term "delivery" cannot reasonably be construed as delivery of the purchase orders to Coleman, for such a construction would have given North American the power to close an agreement to which Coleman never assented merely by delivering the terms to Coleman. (See *Lawrence Block Co.* v. *Palston, supra,* 123 Cal.App.2d at p. 310.) "Delivery" must therefore mean delivery of the specified items. Delivery of goods is a mode of acceptance commonly recognized in commercial dealings (see, e.g., Com. Code, § 2206), although in this case such a means of acceptance was probably not contemplated because of the length of time required for performance. The contract also provided for acceptance by "acknowledgment" of receipt of the purchase orders, and acknowledgment copies were provided.[2]

On July 15, the president of Coleman acknowledged the purchase orders by signing and sending them to North American. Ordinarily this action would be an acceptance by Coleman of all the terms of the contract. According to the findings of the trial court, however, "on July 7, 1959, at a conference between engineers of defendant [North American]

---

[1] The original invitation to bid sent to Coleman by North American stated "If you are the successful bidder, you will be *offered* a purchase order. . . ." (Italics added.)

[2] Although each purchase order sent to Coleman contained in small print the recital that it would become a binding contract when accepted "either by acknowledgment or delivery," it advised in much larger print, "PLEASE SIGN ACKNOWLEDGMENT OF THIS PURCHASE ORDER AND RETURN IMMEDIATELY ATTENTION: PURCHASING DEPARTMENT." Accompanying each purchase order was a separate sheet entitled "ACKNOWLEDGMENT OF PURCHASE ORDER," providing space for the offeree-seller's signature over the repeated designation, "ACKNOWLEDGMENT—RETURN IMMEDIATELY TO PURCHASING DEPARTMENT." Even more significantly, each of the five "go ahead" telegrams received by Coleman on July 24 declared that North American's contractual liability would be limited to a specified figure "pending formal execution of confirming purchase order *and your acknowledgment thereof*" (italics added). In ascertaining the intent of parties to a contract the written portions, e.g., the telegrams in the case at bar, control its printed portions, e.g., the mention of "delivery" in the purchase order form. (Civ. Code, § 1651.)

and engineers of plaintiff [Coleman], defendant's engineers for the first time informed plaintiff's engineers that defendant desired the trailers to be designed with the payload center of gravity 35 inches above the rail top surfaces.'' The court further found that ''After the conference on July 7, 1959, defendant requested plaintiff to continue working on the project, the subject matter of the contract, and stated that changed specifications would be forthcoming from defendant to plaintiff'' and that ''At defendant's request, pursuant to the contract between plaintiff and defendant, plaintiff had been performing work and rendering services for defendant for defendant's use and benefit. . . .''

These findings and the testimony in the record are ambiguous as to whether, after the meeting of July 7, the parties had agreed that the 35-inch figure was to be followed, or had only decided that the rail height figure was *not* the proper one. For example, Mr. Nolan, Coleman's project engineer in this case, testified on direct examination:

''Q. Mr. Nolan, so far as the engineering department, you were the project engineer, is it or is it not true that there was no final decision between North American and Coleman as to the location of the center of gravity of the payload so far as you know? A. That's right.''

The witness further testified on direct examination:

''A. We said this is the way we're going to design it and North American people said they wanted the CG, the load factors applied to the CG with the height above the rail, the center of gravity which was a number that we didn't know exactly how high the CG was.

''Q. Did North American say they knew? A. No, they didn't know how high it was exactly but they knew it was in the neighborhood of 36 inches and so it was arranged . . . to be phoned back.''

On cross-examination, Mr. Nolan testified further regarding the meeting:

''Q. And then, that same afternoon, Mr. Burcombe telephoned you and gave you 35.25 inches CG height above the rails? A. Yes. . . .

''Q. You knew on July 7th, didn't you, that the Coleman design placing the CG of the pay load at rail height and applying the load factors at that point, would not meet the side loads if the pay load CG were placed 35 inches above the rails? . . . THE WITNESS: Yes.''

Mr. Burcombe, a North American project engineer, testified on direct examination that at the July 7 conference Mr. Nolan "brought up the matter of CG. He said their stress people had been figuring that the CG was located at rail height and having seen the missile, he knew intuitively that it was not at rail height—that it was some distance above this, and he requested us to determine or give him the figure of what it should be. I knew it was somewhere in the neighborhood of 36 or 37 or 38 inches, but to be sure, I told him we would find out for sure upon our return and call him back and give him an exact figure and it was later confirmed in writing and upon return to the North American plant we determined that it was 35.52 inches above the rails, which I phoned to him, and told him that we had confirmed this. We eventually rounded it off at 35 inches.''

Whether or not a new center of gravity figure had been finally agreed upon at this point, there would be no contract. On the one hand it may be that the parties simply did not know precisely where the center of gravity was to be located, in which case there would be no agreement. On the other hand, if the understanding was that the 35-inch figure was the proper one, still there would be no agreement. Specifications had not yet been supplied, time of performance had not been agreed upon, and the very important price term remained to be settled. The record makes clear that both parties were of the opinion, even before July 15, that the precise location of the payload center of gravity was to be an essential element of their contract.[3]

Nothing in the record suggests that the parties agreed to go ahead on the basis of the original rail-height specification until

[3] A Coleman interoffice memorandum dated July 8 states that placing the payload center of gravity at 35 inches above the rails "will practically double the loads on most of the members and cause most of the stress work performed to date to be recalculated. A lot of redesign will have to be performed as a result of the increased member sizes, the fabrication costs will increase due to material sizes increases, and the schedule will suffer a delay.

"A cost estimate is being prepared for these changes and little work can be performed that will not be affected by the above changes.''

Coleman's project engineer, Mr. Nolan, testified that his opinion as of July 8 was that if the payload center of gravity were to be placed at 35 inches above the rails it would "cause most of the stress work performed to date to be recalculated,'' "a lot of redesign would have to be performed,'' "the fabrication cost will increase,'' "the schedule will suffer a delay,'' and "little work [could] be performed that would not be affected by the changes on this project.'' Mr. Nolan further testified that the engineering necessary to place the payload center of gravity at the point specified in the telephone call of July 8 "would be entirely

some formal change was made. In the interoffice memorandum of July 8, Coleman instructed its contract administrator to call North American's buyer "and ask him to send us a letter or a change to the specifications defining where they want the center of gravity, *if not at the top of the load rails.*" (Italics added.) Such an inquiry would have been meaningless had Coleman actually intended to proceed with building a trailer with the payload center of gravity at rail height.

Coleman's pleadings are also instructive. They indicate, not that Coleman intended to proceed on a rail-height basis until further notice, but that it planned to build the trailers according to some other specification—somewhere in the area of 35 inches above rail height—which was still to be supplied. In its complaint Coleman alleged that "defendant orally informed plaintiff that a change in specifications would be furnished so that a trailer unit would be produced that would do the job contemplated." Coleman further alleged that "Plaintiff, relying on the advice the defendant had previously given it, as above alleged, had been proceeding on the contract for some time on the basis of the changed specifications even before the written changed specifications were received." And in its pre-trial statement, Coleman stated that "plaintiff, based on the request of North American to proceed with the design and engineering work, did proceed with this engineering and design work to design a positioning trailer with the center of gravity 35 inches above rail height."

The understanding of North American in this regard is also clear. The following testimony was elicited from Mr. Burcombe on *cross-examination* by Coleman:

"Q. Sir, would you have expected Coleman Engineering after July 8th, 1959, to have made a drawing of the parts of the positioning trailer with the CG at rail height, after the conferences you had? A. We wouldn't expect them to, no.

"Q. You would have expected them to have been drafting along the lines you suggested and requested, isn't that right? A. Designing to our interpretation of the specifications, placing CG at 35 inches above the top of the rail.

"Q. You certainly wouldn't expect them after that confer-

different" from that required to build a trailer with a payload center of gravity at rail height.

North American's project engineer, Mr. Burcombe, testified on cross-examination that the missing specification of a vertical payload center of gravity was an "important" and "very significant" dimension in this case.

ence to go ahead on the other interpretation, would you, sir? A. I wouldn't expect them to, no.

"Q. It would have been a waste of time, isn't that right? A. That's right."

In these circumstances I cannot conclude that on July 15 Coleman intended to enter into a contract to build a trailer according to its own design despite its knowledge that, in the words of Coleman's own engineer, "it was not what they [North American] wanted, that they wanted the design load applied at a high CG, some distance above the rails." This knowledge gained by the Coleman engineers at the July 7 meeting is, of course, imputed to the corporation (*Sanfran Co. v. Rees Blow Pipe Mfg. Co.*, 168 Cal.App.2d 191, 204-205 [335 P.2d 995]; cf. Civ. Code § 2332).

Thus, when the purchase orders were signed on July 15, Coleman knew that the specification intended by North American was not for a payload center of gravity at rail height. In signing the purchase orders with this knowledge, it could not purport to accept an offer describing a center of gravity at rail height. (17 Am.Jur.2d, Contracts, § 146, pp. 493-494; 3 Corbin, Contracts (1960 ed.) § 609; *Ex parte Perusini Const. Co.*, 242 Ala. 632, 636 [7 So.2d 576]. Cf. *Lemoge Electric v. County of San Mateo*, 46 Cal.2d 659, 662-663 [297 P.2d 638]; *Brunzell Constr. Co. v. G. J. Weisbrod, Inc.*, 134 Cal.App.2d 278, 286 [285 P.2d 989].) For the same reasons, North American could not maintain that Coleman had agreed to perform according to new specifications but at the original bid price. North American was fully aware, before July 15, that Coleman had bid on the basis of a payload center of gravity at rail height and that Coleman's position was that changes would be required in cost and price terms and in the time schedule.

The actions of both parties after July 15 demonstrated that the price, time of performance, and specifications for the center of gravity were not regarded as settled from the outset. Both parties treated the contract as an agreement to agree,[4] relying on the change clause of the purchase orders as a basis for adjustment in specifications, price, and time of performance through future negotiations. After July 15 there were numerous negotiations concerning these open terms.

---

[4]In his opening statement to the trial court, Coleman's attorney stated: "Now, have in mind, I know the cases are legend that holds [*sic*] that an agreement to hold in the future is no agreement at all . . . I wonder if that is where we are. An agreement to agree. Assuming that's where we are, then, of course, we will be left with a quantum meruit. . . ."

Agreements to agree are valid and enforceable if unessential elements only are reserved for the future agreement. "The general rule is that if an 'essential element' of a promise is reserved for the future agreement of both parties, the promise gives rise to no legal obligation until such future agreement is made." (*City of Los Angeles* v. *Superior Court*, 51 Cal.2d 423, 433 [333 P.2d 745]. See *Wong* v. *Di Grazia*, 60 Cal.2d 525, 539 [35 Cal.Rptr. 241, 386 P.2d 817]; *Apablasa* v. *Merritt & Co., supra*, 176 Cal.App.2d 719, 730; *Putman* v. *Cameron*, 129 Cal.App.2d 89, 95 [276 P.2d 102]; *Avalon Products, Inc.* v. *Lentini*, 98 Cal.App.2d 177, 179 [219 P.2d 485]; 1 Corbin, Contracts (1963 ed.) § 29, pp. 84-85.)

Whether a term is "essential" "depends upon the relative importance and the severability of the matter left to the future; it is a question of degree. . . ." (*City of Los Angeles* v. *Superior Court*, 51 Cal.2d 423, 433 [333 P.2d 745].) The relative importance of a term may turn in part upon the intentions of the parties. (See 1 Corbin, Contracts (1963 ed.) § 29, pp. 89-90.) When, however, "a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." (*California Lettuce Growers, Inc.* v. *Union Sugar Co.*, 45 Cal.2d 474, 481 [289 P.2d 785, 49 A.L.R.2d 496]. See also *Ellis* v. *Klaff*, 96 Cal.App.2d 471, 478 [216 P.2d 15].) At times, subsequent conduct of the parties may establish the contours of an agreement that appeared uncertain at its inception and thus render it enforceable. (*Bohman* v. *Berg*, 54 Cal.2d 787, 794-795 [8 Cal.Rptr. 441, 356 P.2d 185].) The history of the Coleman-North American negotiations, however, establishes just the contrary; the course of events magnified and made clearer the original uncertainty of their agreement and intentions concerning many essential details. Neither design specifications, price, nor time of performance had been agreed upon, nor were they ever finally agreed upon, and the parties' extended negotiations demonstrate that they deemed both the specifications[5] and price[6] to be essential. Since both

---

[5]Lack of agreement concerning specifications, especially where, as here, they deal with the design of a major element constituting the object of the contract, may vitiate any attempt upon the part of the parties to have an enforceable agreement. (See *Colorado Corp.* v. *Smith*, 121 Cal. App.2d 374, 376-377 [263 P.2d 79]; 1 Williston, Contracts (3d ed.) § 42, pp. 135-136; cf. *Putman* v. *Cameron, supra*, 129 Cal.App.2d 89, 95-96.)

[6]It has been held that when the price term is expressly left to be agreed

of these terms as well as the time of performance[7] were left to future agreement, there can be no question that essential elements were left to be agreed upon. The open terms were the very substance of the contemplated contract.

Under these circumstances, the change clause of the purchase orders cannot give rise to a contract, for without an initial agreement on the essential terms there are no standards to govern the meaning of the change clause. The change clause itself is then affected by the basic uncertainty that precludes the existence of a contract. The parties may not invoke the change clause, designed to meet unforeseen contingencies, to make a contract when there has been no agreement from the outset on essential matters.

Since no contract arose when Coleman acknowledged the purchase orders, the trial court erred in awarding damages pursuant to the termination clause in those orders. When performance is rendered by one party in the mistaken belief that an enforceable contract exists, his remedy is in quantum meruit. (See 3 Corbin, Contracts (1960 ed.) § 599, pp. 593-595, fn. 22, citing *Peerless Glass Co.* v. *Pacific etc. Co.*, 121 Cal. 641, 647 [54 P. 101].) Ordinarily, the measure of recovery is the reasonable value of benefits conferred upon the other party. (*Challenge Cream & Butter Assn.* v. *Royal Dutch Dairies*, 212 Cal.App.2d 901, 908 [28 Cal.Rptr. 448]; *Townsend Pierson, Inc.* v. *Holly-Coleman Co.*, 178 Cal.App.2d 373, 378 [2 Cal.Rptr. 812]; *Major-Blakeney Corp.* v. *Jenkins*, 121 Cal.App.2d 325, 340 [263 P.2d 655].) If the other party received no benefit, there is ordinarily no obligation to make restitution. (*Ibid.*)

In the present case it does not appear that North American benefited by Coleman's performance. Nevertheless, after the

---

upon, there is no contract until agreement is reached. (*California Lettuce Growers, Inc.* v. *Union Sugar Co.*, supra, 45 Cal.2d 474, 481-482; *Avalon Products, Inc.* v. *Lentini*, supra, 98 Cal.App.2d 177, 179-180; *Noel* v. *Dumont Builders, Inc.*, 178 Cal.App.2d 691, 696 [3 Cal.Rptr. 220]; *Beech Aircraft Corp.* v. *Ross* (10th Cir. 1946) 155 F.2d 615, 618.) Although this rule has been abrogated in the area of contracts for the sale of goods (Com. Code, § 2305), the comments to that section point out that, at least in part, the change relies on other unique features of the Uniform Commercial Code. (See Com. Code, § 2305; Uniform Commercial Code, com. 1.)

[7] Although in the absence of a specified date, courts will imply a reasonable time for performance (*Wong* v. *Di Grazia*, supra, 60 Cal.2d 525, 536), the absence of a specified time contributes to the uncertainty as to whether there was an agreement. (Compare *Hancock Oil Co.* v. *McClellan*, 135 Cal.App.2d 667, 670 [288 P.2d 39].)

misunderstanding as to the center of gravity was discovered at the July 7 conference, Coleman continued to perform at North American's express request. Had the contemplated contract envisaged the performance of services instead of the production of trailers, there would be no doubt that Coleman could recover the reasonable value of its work whether or not it benefited North American. When one person performs services at the request of another, the law raises an obligation to pay the reasonable value of the services. (*Williams* v. *Dougan,* 175 Cal.App.2d 414, 418 [346 P.2d 241].) The Restatement of Restitution rationalizes this rule with the requirement that a benefit can be conferred as a prerequisite to restitution by stating that a benefit is conferred upon another if a person "performs services *beneficial to or at the request of the other,* . . ." (See Rest., Restitution, § 1, com. b, p. 12. Italics added.) Although this rule has usually been applied when services or work and labor were requested in their own right, rather than as incidental to the construction of a specified item to be sold to the defendant (see *Williams* v. *Dougan, supra,* 175 Cal.App.2d 414; *Bodmer* v. *Turnage,* 105 Cal.App.2d 475, 477-478 [233 P.2d 157]), there is no basis for limiting the rule to the performance of services. If in fact the performance of services has conferred no benefit on the person requesting them, it is pure fiction to base restitution on a benefit conferred. "[I]t is submitted that allowing a recovery in these cases on a theory of benefit conferred is purely fictional, and that the real basis is a moral obligation to restore to his original position a party who has acted to his detriment in reliance on a representation, technically unenforceable, by another that he will give value for the detriment suffered." (Note (1928) 26 Mich.L.Rev. 942, 943.)

In *Kearns* v. *Andree,* 107 Conn. 181 [139 A. 695, 59 A.L.R. 599], the court allowed the plaintiff recovery for services performed at the request of the defendant, explicitly recognizing that no benefit was conferred upon the defendant. The defendant had agreed to buy the plaintiff's building and at the defendant's request the plaintiff made alterations in the building in preparation for its transfer to the defendant. The defendant refused to buy the building and the agreement was held to be too indefinite for enforcement. The plaintiff was nevertheless allowed to recover the reasonable value of his services, without regard to the fact that no benefit was conferred upon the defendant. The court held that recovery of the

reasonable value of services performed, without regard to actual benefit, should be allowed "where the parties have attempted to make a contract which is void because its terms are too indefinite, but where one party has, in good faith, and believing that a valid contract existed, performed part of the services which he had promised in reliance upon it." (*Id.* at pp. 187-188.)

*Kearns* v. *Andree* has been cited approvingly[8] and has been recently followed in another jurisdiction. (See *Abrams* v. *Financial Service Co.*, 13 Utah 2d 343, 346 [374 P.2d 309].) In my opinion, it should be followed here. When two parties mistakenly believe that a contract exists between them, but the agreement is too uncertain and indefinite to be enforced, the one rendering performance and incurring expenses at the request of the other should receive reasonable compensation therefor without regard to benefit conferred upon the other. Such a rule places the loss where it belongs—on the party whose requests induced performance in justifiable reliance on the belief that the requested performance would be paid for.

I would reverse the judgment and remand the case to the trial court to determine the damages pursuant to the foregoing **rule.**

Mosk, J., concurred.

Appellant's petition for a rehearing was denied January 25, 1967. White, J.,* sat in place of Tobriner, J., who deemed himself disqualified. Traynor, C. J., and Mosk, J., were of the opinion that the petition should be granted.

---

[8]See 3 Corbin, Contracts (1960 ed.) § 599, p. 595, fn. 22; Fuller & Perdue, *The Reliance Interest in Contract Damages*: *2*, 46 Yale L.J. (1937) 373, 395-396; Note (1928) *supra*, 26 Mich.L.Rev. 942, 943-944.

*Retired Associate Justice of the Supreme Court sitting under assignment of the Chairman of the Judicial Council.